UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

WILLIAM DEENENE LUCIER,

                  Plaintiff,                    Case No. 12-cv-12110

                                                Paul D. Borman

v.                                         United States District Judge

                                                David R. Grand

CITY OF ECORSE, a Municipal            United States Magistrate Judge
Corporation, et al.,

_____/

**OPINION AND ORDER GRANTING IN PART AND DENYING IN PART
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (ECF NO. 18)**

      Before the Court is Defendants City of Ecorse, a Municipal Corporation, Ecorse Police

Chief/Public Safety Director, Gerald Champagne, Ecorse Police Sergeant James Frierson, Ecorse

Police Sergeant Narda Bruno, Ecorse Police Officer L. Tidwell, Ecorse Police Corporal Kevin

Barkman, Ecorse Police Officer W. McCaig and Ecorse Police Officer Graham's Motion for

Summary Judgment. (ECF No. 18.) Plaintiff filed a Response (ECF No. 28) and Defendants filed

a Reply (ECF No. 31). The Court held a hearing on December 16, 2013.

      After the hearing, the parties filed, on January 13, 2014, a Joint Response to Court Order

Requiring the Parties to Provide the Court with Documentation Concerning Plaintiff's Plea. (ECF

No. 39.) The parties then filed, on January 24, 2014, a Supplemental Joint Response to Court Order

Requiring the Parties to Provide the Court with Documentation Concerning Plaintiff's Plea. (ECF

No. 40.) For the reasons that follow, the Court GRANTS IN PART and DENIES IN PART

Defendants' Motion for Summary Judgment.

**INTRODUCTION**

This action involves Plaintiff's claims that Defendants violated his civil rights when they arrested him after being called by his wife to their home in the early morning hours of July 16, 2010. In her 911 call that morning, Plaintiff's wife informed dispatch that her husband had consumed a fifth and a half of tequila, was breaking things everywhere, throwing glass and "going crazy." When officers arrived they encountered Plaintiff in the basement playing his drums loudly and ignoring officer's request to stop. A struggle to gain Plaintiff's attention and cooperation ensued, resulting in his ultimate arrest.

Plaintiff claims that officers used excessive force in deploying their tasers twice and slapping him in the face in the basement of his home and tasering him again when securing him in the rear of the patrol car. Plaintiff alleges against the individual Defendants claims of gross negligence, assault and battery, excessive force and supervisory liability. Plaintiff also claims that the City of Ecorse had a custom or policy of failing to take disciplinary action against or otherwise supervise its officers.[1]

**I.      BACKGROUND**

Plaintiff has a liver disorder that he attributes in part to long term alcohol abuse. Plaintiff has suffered seizures that he attributes to spikes in his ammonia levels that also cause him to become disoriented, confused and prone to erratic behavior. Plaintiff quit drinking altogether in 2009. (Pl.'s Resp. Ex. 2, Jan. 3, 2013 Deposition of William Lucier, 45-47, 147-48.) However, on the night of

---

[1] Plaintiff also asserted other claims that he has now agreed to dismiss. Plaintiff's counsel stated on the record at the summary judgment hearing that Plaintiff has stipulated to the dismissal of Officers Bruno and Tidwell. Plaintiff's counsel also informed the Court at the hearing that Plaintiff would not be pursuing Count VII of the Complaint, a Due Process claim based on the timing of Plaintiff's arraignment.

2:12-cv-12110-PDB-DRG   Doc # 41   Filed 03/27/14   Pg 3 of 56   Pg ID 1469

his arrest on July 16, 2010, Plaintiff went on a self-described binge and drank a full fifth of Cuervo tequila and a half of a fifth of Toro tequila. (*Id*. 48, 53-54.) Plaintiff recalls very little about what happened the evening of his arrest - he remembers hugging his wife goodnight, making plans with her to walk the dog the next morning and his next memory is sitting in the back of a police car outside his home. (*Id*. at 56, 58-59, 60-61.) Plaintiff remembers sitting with his legs outside of the police car and recalls officers trying to "spin" him into the car. Plaintiff recalls that he was unable to comply because his back is fused and he was "unable to spin that way." (*Id*. at 61-62.) It is undisputed that Plaintiff broke his back in a work-related accident in 2005, rendering him totally disabled. (*Id*. at 13-15.) Plaintiff has no recollection of what he said to officers, or they to him, as they were trying to get him into the back of the police car. (*Id*. at 62-63.) Plaintiff does not recall being tased by officers at any time, either in the basement or while seated in the police car, although it is undisputed that he was tased at least three times and a taser probe remains embedded in his chest. (*Id*. at 116, 118-19.)

The details of that night that Plaintiff does not remember, as filled in by his wife and the arresting officers, are as follows. Sometime in the early morning hours of July 16, 2010, Plaintiff's wife awoke to a loud noise and investigated to find her husband crashing a buffet full of dishes and knick-knacks onto the floor of their home. (Pl.'s Resp. Ex. 3, March 7, 2013 Deposition of Michelle Lucier 30-32; 37-38; Pl.'s Resp. Ex. 13, Sept 7, 2011 Affidavit of Michelle Lucier ¶¶ 2-3.) Plaintiff's husband had a history of issues with his ammonia levels which caused him to "act weird" at times. (Michelle Lucier Dep. 17-18.) He also had a history of seizures, cause unknown, which sometimes caused Plaintiff to become aggressive. (*Id*. at 10-11, 19-20, 24; William Lucier Dep. 87-89.) Plaintiff's wife became concerned at her husband's destructive behavior on the night of July

3

16, 2010, and called 911, telling the dispatch operator, Lt. Blade, that her husband was "acting crazy:"

| | |
|---|---|
| Dispatch: | Ecorse emergency, what's the problem? |
| Mrs. Lucier: | I need the police at 44 West Charlotte. Um, my husband's going crazy. |
| Dispatch: | Your what? |
| Mrs. Lucier: | Husband's going crazy; he's throwing glass and breaking things everywhere. |
| Dispatch: | What's the problem with him? |
| Mrs. Lucier: | I don't know. He drank. Tequila. |
| Dispatch: | 44 West Charlotte? |
| Mrs. Lucier: | Yeah. |
| Dispatch: | Alright. |
| Mrs. Lucier: | Okay, thank you. |
| Dispatch: | Ecorse cars. Start heading to 44 West Charlotte on some kinda domestic. Four Four West Charlotte. |

Transcript of 911 Audio ( Pl.'s Resp. 4).[2]  Mrs. Lucier believed at the time that her husband was having "some kind of medical problem," although she does not recall describing the problem as "medical" to the 911 dispatcher.  (Michelle Lucier Dep. 37-38, 40-41.)  In retrospect, she thinks maybe she should have called EMS rather than the police, but at the time she didn't understand what was wrong with her husband.  (*Id.* at 39.)  Defendants Barkman, McCaig, Frierson and Graham responded to the call.

According to Mrs. Lucier, just after she placed the call, her husband calmed down, returned to the basement and commenced playing his drums as if nothing had happened.  (Michelle Lucier Dep. 42-43.)  Mrs. Lucier testified that if she had known Plaintiff was going to suddenly calm down, return to the basement and continue playing his drums as if nothing had happened, she likely would not have called police and would have handled the situation herself.  (*Id.* at 39-40.)

---

[2] Plaintiff failed to attach a copy of the transcript of the 911 call to his response but the parties do not dispute the content of the 911 call.

4

Nevertheless, Mrs. Lucier testified that when officers arrived she led them downstairs (not telling them that she didn't need their help), and tried to get Mr. Lucier's attention, who was seated behind his drum set continuing to play.  His eyes were closed, he was playing the drums loudly and did not respond.  (*Id*. at 45, 49.)  Officers tried verbally to get Mr. Lucier's attention and finally Officer Barkman grabbed one of the cymbals and Plaintiff opened his eyes.  (Pl.'s Resp. Ex. 7, March 8, 2013 Deposition of Corporal Kevin Barkman 49.)

    The facts as to what occurred in the basement from this point forward are very much in dispute.  According to Mrs. Lucier, who claims to have accompanied officers into the basement, when her husband opened his eyes and saw the officers, he stood up, dropped the drumsticks on the floor by his side and then sat back down behind his drum set.  (Michelle Lucier Dep. 52-53.)  Mrs. Lucier recalled that after Plaintiff sat back down, officers started yelling "taser, taser" and tasers started going off all around her. Plaintiff states that Mr. Lucier had fallen to the ground "flinching around" from being tased as she screamed at officers that her husband's back was broken and begged them to stop.  (*Id*. at 53.)  Plaintiff was tased once in the chest by Officer McCaig while he was still behind his drum set and once by Barkman, whose probes did not fully connect.  (Pl.'s Resp. Ex. 4, March 28, 2013 Deposition of Sergeant William McCaig 11; Barkman Dep. 72.)

    After the tasing, after Plaintiff fell to the ground, Barkman then put his knees in Plaintiff's back and handcuffed him.  (Barkman Dep. 72-73.)  Once handcuffed and on his feet, Plaintiff again fell to the ground. (Barkman Dep. 74.)  According to Mrs. Lucier, officers dropped Plaintiff on the ground after he had been tased and handcuffed, causing him to hit his head on the concrete floor. (Michelle Lucier Dep. 57; Michelle Lucier Aff. ¶ 27.)  Mrs. Lucier testified that Mr. Lucier never attacked the officers and stated that after Plaintiff finally stood up in the handcuffs, Barkman slapped

5

Plaintiff forcefully in the face, so hard that she could hear it echo in the basement. (Michelle Lucier Aff. ¶ 28; Michelle Lucier Dep. 59.) Mrs. Lucier recalls her husband telling Barkman that he "slapped like a bitch." (Michelle Lucier Dep. 59.) Mrs. Lucier testified that her husband never spit in any one's face and that the slap was totally unprovoked. (*Id.* at 59.) Mrs. Lucier said that officers escorted her husband up the stairs and that he was cooperative. (*Id.* at 60.) Mrs. Lucier did not follow the officers as they escorted Plaintiff out to the police car. (*Id.* at 62.) Mrs. Lucier testified that she was contacted the next day by prosecutors and asked if she wanted to press domestic abuse charges against her husband. She responded "no," she did not, that he had not touched her and she was more traumatized by what the officers did to her husband than about what happened to her house. (*Id.* at 64; ECF No. 39, Jt. Supp. Resp. PgID1430, Wayne County Prosecuting Attorney's Recommendation (noting Michelle Lucier did not wish to prosecute on domestic violence).)

Officers tell a different story of events that transpired in the basement. First, none of the officers recalls Mrs. Lucier following them into or being present in the basement. (Barkman Dep. 65-66; March 8, 2013 Deposition of Sergeant James Frierson 26; March 28, 2013 Deposition of Sergeant William McCaig 10.) Officer Graham expressly testified that Mrs. Lucier did not go into the basement and that because the officers believed they were responding to a domestic disturbance call, they would have made an effort to keep the husband and wife apart. (March 8, 2013 Deposition of Celeste Graham 10; McCaig Dep. 17.) Officer McCaig testified that when he was walking Plaintiff up the stairs, Mrs. Lucier was just coming down the stairs. (*Id.*) Thus, in addition to the widely varying factual accounts of what actually occurred in the basement, there is a disputed issue of fact in the first instance as to whether Mrs. Lucier was even in the basement able to observe any of the events alleged to have transpired there.

According to the officers, when they were dispatched to the Lucier home, they were under the impression that they were responding to a domestic disturbance. (Barkman Dep. 58; Frierson Dep. 7; Graham Dep. 6; McCaig Dep. 6.) They were met at the door by Mrs. Lucier who was visibly upset and upon entering the home the officers noticed that the home was in disarray with broken glass and furniture strewn all over on the floor. (Michelle Lucier Dep. 48; Barkman Dep. 62-63; Frierson Dep. 9.) Mrs. Lucier informed officers that her husband was drunk but did not mention any medical conditions. (Barkman Dep. 64-65; Frierson Dep. 14; McCaig Dep. 17.) The officers proceeded downstairs where Plaintiff was playing his drums loudly and not responding to officer's commands to stop. (Barkman Dep. 69; Frierson Dep. 28-29; Graham Dep. 14.) Barkman then put his hand on the cymbal and Plaintiff stopped playing. (Barkman Dep. 70.)

At that point, according to each of the officers, Plaintiff threw his drumsticks at the officers, hitting Barkman in the head and Graham in the knee. (Barkman Dep. 70; Frierson Dep. 17-18; Graham Dep. 13.) Plaintiff then started to lunge at the officers at which point Barkman unholstered his taser and yelled "taser, taser" and then both he and McCaig deployed their tasers in probe mode toward Plaintiff's chest/abdomen. (Barkman Dep. 72-75, 77; McCaig Dep. 11.) Plaintiff fell to the ground and Barkman was able to handcuff Plaintiff after placing a knee in Plaintiff's back. After Plaintiff stood up, he pulled away from Barkman and again fell to the ground. (Barkman Dep. 73-75.) According to Barkman, as officers were escorting Plaintiff to the stairs, Plaintiff was belligerent and tried to spit in Barkman's face. (Barkman Dep. 79, 83.) Barkman pushed Plaintiff's face away. (Barkman Dep. 80.) Thus, there are multiple genuine disputed issues of material fact created by the officer's and Mrs. Lucier's testimony as to what transpired in the basement.

According to officers, once Plaintiff was placed in the back of the patrol car, he refused to

7

put his feet in the car and was warned that if he continued to refuse he would be tased.  (McCaig

Dep. 17.)  According to McCaig, Plaintiff was sitting in the back of the patrol car with his legs

outside the car, cursing and kicking at officers and refusing to put his legs in the vehicle.  (McCaig

Dep. 18.) McCaig, perceiving Plaintiff to be aggressive and non-cooperative, walked around to the

opposite side of the patrol car and delivered a drive stun to Plaintiff's hip with his taser.  (McCaig

Dep. 18-19.)  According to McCaig, Plaintiff was belligerent, non-compliant and kicking at

McCaig's fellow officer Barkman.  McCaig told Plaintiff to stop kicking at Officer Barkman and

when Plaintiff did not comply, Officer McCaig delivered the drive stun to gain Plaintiff's

compliance.  (McCaig Dep. 39-40.)

According to Anthony Hedges, one of the EMTs called to the station to examine Plaintiff,

Plaintiff was very physical and verbally abusive, combative and refused treatment.  (Def.'s Mot. Ex.

I, March 28, 2013 Deposition of Anthony Hedges 8, 10, 12.)  According to Hedges, who had no

independent recollection of the call to treat Plaintiff but testified based on a review of his report,

Plaintiff was alert and oriented and all vitals were within normal range.  (*Id*. at 5, 11.)  Hedges

testified that if a person is unconscious, confused or disoriented, they would not be permitted to sign

off on medical treatment.  (*Id*. at 7.)  Hedges was given no information on whether or not Plaintiff's

blood alcohol had been tested but would have noted in the report if Plaintiff had appeared to be

intoxicated or had been drinking. (*Id*. at 7, 11-12.)  Because the report indicated that Plaintiff was

oriented times three, Hedges testified that his level of responsiveness did not indicate intoxication.

(*Id*. at 12.)  Hedges testified, again based on a review of his report, that Plaintiff made no mention

of having been tased or it would have appeared in his report.  (*Id*. at 8, 15-16.)  Hedges testified that

he had never received training on treating taser wounds or removing taser probes.  (*Id*. at 8-10.)

Hedges testified that he relied on information he receives from the patient, not from the officers, but if he had been informed by officers that Plaintiff had been tased and still had a taser probe in him, Plaintiff would have been transported to the hospital. (*Id*. at 9, 15-16.) According to Hedge's report, all of Plaintiff's vital signs were within normal range, Plaintiff made no complaints of pain or discomfort at all and refused to go the hospital. (*Id*. at 10, 17-18.)

Plaintiff's arrest occurred in the early morning hours on Friday, July 16, 2010. He was detained in jail over the weekend, arraigned on Monday and released on Wednesday. (William Lucier Dep. 153.) He was initially charged with assault, obstructing and resisting arrest. Plaintiff pled guilty to resisting arrest and the assault and obstructing charges were dropped. (William Lucier Dep. 122-23; ECF No. 39, Jt. Supp. Resp. PgID# 1427, Stip. To Add A Second Count Pursuant to Plea Bargain.)

## II.    STANDARD OF REVIEW

Pursuant to Federal Rule of Civil Procedure 56, a party against whom a claim, counterclaim, or cross-claim is asserted may file a motion for summary judgment "at any time until 30 days after the close of all discovery," unless a different time is set by local rule or court order. Fed. R. Civ. P. 56(b). Summary judgment is appropriate where the moving party demonstrates that there is no genuine dispute as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); Fed. R. Civ. P. 56(a). "Of course, [the moving party] always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323. *See also Gutierrez v. Lynch*, 826 F.2d 1534, 1536 (6th Cir. 1987).

A fact is "material" for purposes of a motion for summary judgment where proof of that fact "would have [the] effect of establishing or refuting one of the essential elements of a cause of action or defense asserted by the parties." *Kendall v. Hoover Co.*, 751 F.2d 171, 174 (6th Cir. 1984) (quoting Black's Law Dictionary 881 (6th ed. 1979)) (citations omitted). A dispute over a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). Conversely, where a reasonable jury could not find for the nonmoving party, there is no genuine issue of material fact for trial. *Feliciano v. City of Cleveland*, 988 F.2d 649, 654 (6th Cir. 1993). In making this evaluation, the court must examine the evidence and draw all reasonable inferences in favor of the non-moving party. *Bender v. Southland Corp.*, 749 F.2d 1205, 1210-11 (6th Cir. 1984). "'The central issue is whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Binay v. Bettendorf*, 601 F.3d 640, 646 (6th Cir. 2010) (quoting *In re Calumet Farm, Inc.*, 398 F.3d 555, 558 (6th Cir. 2005)).

If this burden is met by the moving party, the non-moving party's failure to make a showing that is "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial," will mandate the entry of summary judgment. *Celotex*, 477 U.S. at 322-23. "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 324. "The test is whether the party bearing the burden of proof has presented a jury question as to each element in the case. The plaintiff must present more than a mere scintilla of the evidence. To support his or her position, he or she must present evidence on which the trier of fact could find for the plaintiff."

*Davis v. McCourt*, 226 F.3d 506, 511 (6th Cir. 2000) (internal quotation marks and citations omitted).  In doing so, the non-moving party may not rest upon the mere allegations or denials of his pleadings, but the response, by affidavits or as otherwise provided in Rule 56, must set forth specific facts which demonstrate that there is a genuine issue for trial.  Fed. R. Civ. P. 56(e). The rule requires the  non-moving party to introduce "evidence of evidentiary quality" demonstrating the existence of a material fact.  *Bailey v. Floyd County Bd. of Educ.*, 106 F.3d 135, 145 (6th Cir. 1997); *see Anderson*, 477 U.S. at 252 (holding that the non-moving party must produce more than a scintilla of evidence to survive summary judgment).  "A party asserting that a fact . . . is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record."  Fed. R. Civ. P. 56(c)(1)(A).

"Rule 56(e)(2) leaves no doubt about the obligation of a summary judgment opponent to make [his] case with a showing of facts that can be established by evidence that will be admissible at trial. . . . In fact, '[t]he failure to present any evidence to counter a well-supported motion for summary judgment alone is grounds for granting the motion.' Rule 56(e) identifies affidavits, depositions, and answers to interrogatories as appropriate items that may be used to support or oppose summary judgment." *Alexander v. CareSource*, 576 F.3d 551, 558 (6th Cir. 2009) (quoting *Everson v. Leis*, 556 F.3d 484, 496 (6th Cir. 2009)).  "One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses, and we think it should be interpreted in a way that allows it to accomplish this purpose."  *Celotex*, 477 U.S. at 323-34.

III.     **ANALYSIS**

A.     **Excessive Force - 42 U.S.C. § 1983**

Plaintiff brings a claim pursuant to 42 U.S.C. § 1983, alleging that officers violated his constitutional right to be free from excessive force by tasing him twice in his basement and once after he was handcuffed and seated in the back of the patrol car.  Plaintiff also claims that officers violated his right to be free from excessive force by slapping his face while he was handcuffed.

Claims regarding an officer's use of excessive force in the context of an arrest or other seizure are governed by the Fourth Amendment:  "Where, as here, the excessive force claim arises in the context of an arrest or investigatory stop of a free citizen, it is most properly characterized as one invoking the protections of the Fourth Amendment."  *Graham v. Connor*, 490 U.S. 386, 394 (1989).  *See also Shreve v. Franklin County, Ohio*, 743 F.3d 126, 133 (6th Cir. 2014) (reaffirming that a claim asserting the use of force in the course of an arrest "arises under the Fourth Amendment and its reasonableness standard.");  *Malory v. Whiting*, 489 F. App'x 78, 82 (6th Cir. 2012) (citing *Drogosch v. Metcalf*, 557 F.3d 372, 378 (6th Cir. 2009)) ("The Fourth Amendment of the United States Constitution protects a person from being subject to excessive physical force during the course of an arrest, a booking, or other police seizure.").  The determination as to whether the officer has exerted excessive force during the course of seizure is determined under an "objective reasonableness" standard.  *Graham*, 490 U.S. at 396-97.  "The 'reasonableness' inquiry in an excessive force case is an objective one: the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation."  *Id*. at 397.  The Court analyzes the challenged conduct from the "perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.*

12

at 396. The Sixth Circuit recently summarized the analytical framework applied in an excessive

force case:

> Under the Fourth Amendment, we apply an objective reasonableness test, looking to the reasonableness of the force in light of the totality of the circumstances confronting the defendants, and not to the underlying intent or motivation of the defendants. *Dunigan v. Noble*, 390 F.3d 486, 493 (6th Cir. 2004); *see also Graham*, 490 U.S. at 396–97, 109 S.Ct. 1865. We balance "the nature and quality of the intrusion on [a plaintiff's] Fourth Amendment interests against the countervailing governmental interests at stake." *Ciminillo v. Streicher*, 434 F.3d 461, 466–67 (6th Cir. 2006). In doing so, three factors guide our analysis: "'[(1)] the severity of the crime at issue, [(2)] whether the suspect poses an immediate threat to the safety of the officers or others, and [(3)] whether he is actively resisting arrest or attempting to evade arrest by flight.'" *Martin v. City of Broadview Heights*, 712 F.3d 951, 958 (6th Cir. 2013) (*quoting Graham*, 490 U.S. at 396, 109 S.Ct. 1865). These factors are assessed from the perspective of a reasonable officer on the scene making a split-second judgment under tense, uncertain, and rapidly evolving circumstances without the advantage of 20/20 hindsight. *Graham*, 490 U.S. at 396–97, 109 S.Ct. 1865.

*Burgess v. Fischer*, 735 F.3d 462, 472-73 (6th Cir. 2013) (alterations in original).

The reasonableness inquiry necessarily entails balancing individual rights with governmental

interests:

> Determining whether the force used to effect a particular seizure is reasonable under the Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake. Our Fourth Amendment jurisprudence has long recognized that the right to make an arrest or an investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it. . . . Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment. The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation.

*Graham*, 490 U.S. at 396-97 (internal quotation marks and citations omitted).

Civil liability will not attach, however, simply because an officer's conduct may be found

to have violated one or more of a plaintiff's constitutional rights. "Qualified immunity shields

federal and state officials from money damages unless a plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right and (2) that the right was 'clearly established' at the time of the challenged conduct." *Ashcroft v. al-Kidd*, __U.S.__, 131 S.Ct. 2074, 2080 (2011). A court need not address these two inquiries in any particular order, and may choose first to determine whether a right was clearly established before deciding whether an officer's conduct on a particular occasion violated that right. *Pearson v. Callahan*, 555 U.S. 223, 236-37 (2009). "A government official's conduct violates clearly established law when, at the time of the challenged conduct, [t]he contours of [a] right [are] sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *al-Kidd*, 131 S.Ct. at 2083 (internal quotation marks, citation omitted) (alterations in original). "'If the law at that time was not clearly established, an official could not . . . fairly be said to 'know' that the law forbade conduct not previously identified as unlawful.'" *Martin v. City of Broadview Heights*, 712 F.3d 951, 960 (6th Cir. 2013) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).

The Sixth Circuit has noted that: "The sources of clearly established law to be considered are limited. We look first to decisions of the Supreme Court, then to decisions of this court and other courts within our circuit, and finally to decisions of other circuits." *Martin*, 712 F.3d at 961 (internal quotation marks and citation omitted). In defining the contours of a right to determine whether it was clearly established at the time of the challenged conduct, a court cannot "generalize too much," nor can it "generalize too little." *Martin*, 712 F.3d at 960 (internal quotation and citation omitted). The precise factual scenario under consideration need not necessarily have been directly addressed in a prior decision:

> The task, then, is not to match each application of force with a precisely analogous case to demonstrate its prohibition. The mere fact that a court has not held the

> particular action in question unlawful is insufficient to create immunity. An action's
> unlawfulness may be plain from direct holdings, from specific examples described
> as prohibited, or from the general reasoning that a court employs. So while the
> contours of a right must be sufficiently clear, a fundamentally similar or materially
> similar case is not required to show it is clearly established.

*Martin*, 712 F.3d at 960-61 (internal quotation marks and citations omitted).

If multiple officers are alleged to have violated a plaintiff's Fourth Amendment rights, each officer's conduct must be analyzed individually. "Each defendant's liability must be assessed individually based on his own actions." *Binay v. Bettendorf*, 601 F.3d 640, 650 (6th Cir. 2010) (citing *Dorsey v. Barber*, 517 F.3d 389, 399 n. 4 (6th Cir. 2008)). "To hold an officer liable for the use of excessive force, a plaintiff must prove that the officer '(1) actively participated in the use of excessive force, (2) supervised the officer who used excessive force, or (3) owed the victim a duty of protection against the use of excessive force.'" *Binay*, 601 F.3d at 650 (quoting *Turner v. Scott*, 119 F.3d 425, 429 (6th Cir. 1997)). "As a general matter, [an officer's] mere presence during [an] altercation, without a showing of some responsibility, cannot suffice to subject them to liability." *Burgess*, 735 F.3d at 475. If an officer does not directly participate in the challenged conduct, "there must be a showing that they either supervised the [officers] who did so or owed [the plaintiff] a duty of protection." *Id.* To established that an officer not directly involved owed a duty of care, it must be shown that the officer "observed or had reason to know that excessive force would be or was being used'" and "'had both the opportunity and the means to prevent the harm from occurring.'" *Id.* (quoting *Turner*, 119 F.3d at 429.) In determining whether an officer had both the opportunity and the means to intervene, the Court must determine that the incident being challenged lasted long enough for the officers to "both perceive what was going on and intercede to stop it." *Id.*

15

### 1.    Officers McCaig and Barkman's use of their tasers.

As of July 16, 2010, the date of Plaintiff's arrest, it was clearly established in the Sixth Circuit that the use of a taser[3] on a non-resistant person who poses no threat of escape or of causing immediate harm violated clearly established law.  *See Bennett v. Krakowski*, 671 F.3d 553, 561 (6th Cir. 2011) ("'[A]bsent some compelling justification—such as the potential escape of a dangerous criminal or the threat of immediate harm—the use of [a stun gun] on a non-resistant person is unreasonable'") (second alteration in original) (quoting *Kijowski v. City of Niles*, 372 F. App'x 595, 600 (6th Cir. April 8, 2010)).  *But see Caie v. West Bloomfield Twp*., 485 F. App'x 92, 96 (6th Cir. 2012) (recognizing that *Kijowski* established that use of a taser on a non resistant person who poses no threat of escape or harm was objectively unreasonable but finding officer's single use of taser in drive stun mode on suspect who had attempted to flee and was failing to cooperate with officer's efforts to apply handcuffs did not constitute excessive force).  The Sixth Circuit has recognized that:

> [C]ases addressing qualified immunity for taser use fall into two groups. The first involves plaintiffs tased while actively resisting arrest by physically struggling with, threatening, or disobeying officers. In the face of such resistance, courts conclude either that no constitutional violation occurred, or that the right not to be tased while resisting arrest was not clearly established at the time of the incident.
>
>        \*                    \*                   \*
>
> In the second group of cases, a law-enforcement official tases a plaintiff who has

---

[3]  It has been observed that TASER is an acronym created by the NASA scientist who created the taser to "[pay] hommage to a book by the Stratemeyer Syndicate, published under the pseudonym Victor Appleton, titled *Tom Swift and His Electric Rifle, or, Daring Adventures in Elephant Land* (1911), where Tom Swift hunted wildlife on the African savannah with an electric rifle he invented." *Cockrell v. City of Cincinnati*, 468 F. App'x 491, 492 n. 3 (6th Cir. 2012).  The taser has two modes, "dart mode" or "drive stun mode." *Id*. at 492.  In "dart" or "probe" mode, the gun propels a pair of barbed darts that penetrate the person's skin and override the central nervous system, causing "excruiating pain that radiates throughout the body," paralyzing the person and rendering them "limp and helpless." *Id*.  In "drive-stun" mode the darts are removed and the contacts on the gun are placed directly on the victim, delivering an electric shock but not overriding the nervous system as in dart mode.  *Id*.

> done nothing to resist arrest or is already detained. Courts faced with this scenario hold that a § 1983 excessive-force claim is available, since "the right to be free from physical force when one is not resisting the police is a clearly established right."

*Cockrell v. City of Cincinnati*, 468 F. App'x 491, 495-96 (6th Cir. 2012).  The Sixth Circuit recently

had occasion to summarize the law in this Circuit as of May, 2010 on taser deployment:

> Looking at cases before May 2010, this Court's analysis of whether a defendant's right to be free from a taser shock was clearly established can be split into two lines of cases. First, this Court has generally found no clearly-established right where the suspect is actively resisting arrest, which can include physically resisting, fleeing the scene despite police orders, and not responding to orders to move. *Hagans v. Franklin Cnty. Sheriff's Office*, 695 F.3d 505, 509 (6th Cir. 2012) (finding it was not clearly established in May 2007 that using a taser repeatedly on a suspect actively resisting arrest and refusing to be handcuffed amounted to excessive force); *Caie v. W. Bloomfield Twp.*, 485 Fed. Appx. 92, 95–96 (6th Cir. 2012) (right not clearly established in 2009 when suspect refused to follow police orders and move his arms from under his body); *Cockrell v. City of Cincinnati*, 468 [F. App'x] 491, 495 (6th Cir. 2012) (holding no clearly established right in 2008, because flight is a form of resistance); *Williams v. Ingham*, 373 Fed. Appx. 542, 548 (6th Cir. 2010) (officers acted reasonably by tasing suspect who would not move his hands from under his body); *Russo v. City of Cincinnati*, 953 F.2d 1036, 1044 (6th Cir. 1992) (finding qualified immunity for police officers who tased a potentially homicidal man who stood a few feet away with knives in each of his hands).
>
> In a second set of cases, this Court has found that plaintiffs' right to be free from a taser shock is clearly established where they have done nothing to resist arrest or are already detained. For example, in *Thomas v. Plummer*, the suspect was repeatedly told to get down on the ground. *Thomas*, 489 Fed. Appx. at 118. When the suspect responded by only dropping to her knees with her hands in the air, the police tased her. *Id*. This Court held that the suspect "posed absolutely no threat" as she hadn't offered any "active resistance." *Id*. at 126. Similarly in *Kijowski v. City of Niles*, we found the right to be free from excessive force clearly established when police dragged an unresisting man from his truck and immediately tasered him. *Kijowski*, 372 Fed. Appx. at 601. In some cases, tasing a previously resistant and violent suspect who no longer poses a threat to the police officers also violates clearly established law. *Landis*, 297 Fed. Appx. at 461 (finding that where the defendant released the police officer and walked into the woods there was "no longer a threat to any of the officers" because the defendant was "not belligerent or verbally resistant" and did not have a weapon).

*Correa v. Simone*, 528 F. App'x 531, 535 (6th Cir. 2013).

17

The constitutional limits on the use of a taser continue to be defined and the Sixth Circuit noted in *Hagans v. Franklin County Sheriff's Office*, 695 F.3d 505 (6th Cir. 2012) that the line between resistance and non-resistance is not easily defined and sometimes deploying a taser is the least forceful means available to an officer to obtain the compliance of an uncooperative suspect:

> This line between suspects who actively resist arrest and those who comply with officers' commands may or may not hold as to the ultimate constitutional question. The taser remains a relatively new technology, and courts and law enforcement agencies still grapple with the risks and benefits of the device. Even as of a year ago, however, it could be said that tasers carry "a significantly lower risk of injury than physical force" and that the vast majority of individuals subjected to a taser—99.7%—suffer no injury or only a mild injury. John H. Laub, Director, Nat'l Inst. of Justice, Study of Deaths Following Electro Muscular Disruption 31 (2011).

695 F.3d at 510. *See also Devoe v. Rebant*, No. 05-71863, 2006 WL 334297, at *6-7 (E.D. Mich. Feb. 13, 2006) (finding a single drive stun to handcuffed suspects lower back after he refused multiple times to get into the police car did not constitute excessive force); *Alexander v. City of Shelby Twp.*, No. 07-cv-14741, 2009 WL 3241974, at *2 (E.D. Mich. Oct. 8, 2009), (finding use of taser objectively reasonable where handcuffed suspect ignored multiple requests to enter the patrol car). *But see Austin v. Redford Twp. Police Dept.*, 690 F.3d 490, 498 (6th Cir. 2012) (noting that *Devoe* and *Alexander* had been subsequently distinguished as cases "involving [a] belligerent and hostile suspect[] who had threatened officers either before or during the order to enter the police car.").

      a.    **Barkman and McCaig's deployment of their tasers in the basement.**

Whether Barkman and McCaig violated Plaintiff's right to be free from excessive force by deploying their tasers in the basement depends upon whose version of the facts one accepts.[4] In the

---

[4] The Court is mindful that separate instances of alleged excessive force must be analyzed separately. *See Binay,* 601 F.3d at 650. However, as to the taser strikes in the basement of the

basement, both McCaig and Barkman deployed their tasers in probe mode nearly simultaneously. According to the officers, at this point they believed that they were on a domestic violence call and had witnessed the significant destruction to the furniture and personal property in the home before entering the basement. Mr. Lucier was completely unresponsive to their verbal commands to stop playing the drums and, when Mr. Lucier finally opened his eyes and stood up from behind his drum set, according to officers, he threw both drumsticks at the officers, striking Barkman in the face and Graham in the knee. Perceiving an immediate threat to officer safety, McCaig and Barkman deployed their tasers. (Pl.'s Resp. Ex. 12, Incident Report 1, 3.) According to Barkman, after Mr. Lucier opened his eyes, he shouted obscenities at the officers, threw his drum sticks at Barkman's head and began to lunge forward through the drum set at Barkman, who shouted "taser, taser," and then deployed his taser striking Mr. Lucier in the chest. (*Id.*) McCaig also discharged his taser at this point, striking Mr. Lucier in the stomach area. (*Id.* at 1.)

McCaig's testimony is similar. McCaig testified that Mr. Lucier jumped up, threw the drum sticks at Barkman's head, also striking officer Graham in the knee (at which point McCaig pulled his taser), and then Mr. Lucier started to lunge at Barkman (at which point McCaig deployed his taser). (Pl.'s Resp. Ex. 4, March 28, 2013 Deposition of Sergeant William McCaig 10-11.) McCaig testified that Mr. Lucier "assaulted two officers" in this confrontation and was about to further attack Barkman, justifying the use of the taser. (*Id*. at 33.) Under these circumstances, Defendants argue,

---

Lucier home, these events occurred in such instantaneous succession, and are alleged by the officers to have been prompted by the same conduct, i.e. Plaintiff's alleged throwing the drumsticks and charging at Barkman, that the Court finds the same analysis applicable to both officers' conduct. *See Kijowski*, 372 F. App'x at 600, n. 10 (observing the need to engage in separate analyses of multiple taser strikes but nonetheless finding it reasonable under the circumstances to analyze the shocks collectively).

under clearly established Sixth Circuit law, the officers reasonably perceived an immediate threat, (the officers had observed the chaos and destruction to the home, had no idea what Mr. Lucier may have had access to behind his drum set and, according to their testimony, he was exhibiting extremely aggressive behavior), and acted reasonably in deploying their tasers.  According to McCaig and Barkman, Mr. Lucier continued to resist their efforts to arrest him for this assault on the officers.  Barkman testified that after being tased, Mr. Lucier fell to the ground and continued "yelling and cussing and kicking when I was trying to handcuff him."  (Barkman Dep. 73.)  McCaig testified that after the tasers were deployed, Mr. Lucier continued resisting officer's efforts to handcuff him.  (McCaig Dep. 14-15.)

In stark contrast to the testimony of the officers, Mrs. Lucier, who claims to have been in the basement at the time witnessing this entire scene, testified both in deposition and in an affidavit, that when Barkman grabbed the cymbal of the drum set, Mr. Lucier "stopped playing the drums, and opened his hands, allowing the drumsticks to fall at the sides of his body."  (Pl.'s Resp. Ex. 11, Lucier Aff. ¶ 18.)  Mrs. Lucier further recalled that her husband simply stood up and asked what was going on: "Bill was still behind a full drum kit, and was not moving in any direction, when I heard an officer shout, 'Taser! Taser!'"  Mrs. Lucier states that tasers were fired at her husband simultaneously, that she watched him seize and fall to the floor and begged the officers to stop because her husband's back was broken in two places.  (*Id*. ¶¶ 19-24.)

Although Plaintiff's version of the facts is disputed by the consistent testimony of the arresting officers, Mrs. Lucier's version of the facts is not "blatantly contradicted" or "utterly discredited by the record," such that "no reasonable juror" would believe her version of the facts. *Scott v. Harris*, 550 U.S. 372, 380 (2007).  *But cf. Kowolonek v. Moore*, 463 F. App'x 531, 539 (6th

Cir. 2012) (applying *Harris* and discrediting witness testimony on summary judgment where the only evidence contradicting the officers was that of a woman whose own testimony was inconsistent and inherently incredible). The Court is cognizant of the fact that Plaintiff pleaded guilty to resisting arrest but this fact alone cannot serve to utterly discredit Mrs. Lucier's testimony in this case. Plaintiff did not plead guilty to assault and in fact the assault charge was dropped. This distinguishes this case from *Wylie v. Overby*, No. 05-cv-71945, 2006 WL 1007643 (E.D. Mich. April 14, 2006), on which Defendants rely. In *Wylie*, the plaintiff had pleaded guilty to assaulting the officers as well as to resisting arrest and the court found that both the assault and the resistance arose from the same course of conduct. Therefore, the court concluded, Plaintiff could not deny his assaultive conduct in a subsequent § 1983 case based on his arrest. The plea transcript in this case does not reflect what conduct formed the basis for Plaintiff's resisting arrest plea but it is undisputed that Plaintiff did not admit to assaulting the officers. There were several times throughout the course of the arrest that Plaintiff allegedly "resisted" arrest. To the extent Plaintiff was "resisting" arrest, the nature and level of his resistance remains a genuine issue of material fact that would dictate the reasonableness of the officers' use of force. *See Wylie*, 2006 WL 1007643, at *7 (recognizing that a conviction for resisting arrest would not necessarily preclude a claim based upon excessive force and proceeding to examine the reasonableness of the officers' use of the taser).

Viewing the facts in the light most favorable to the Plaintiff, the use of a taser on a subject who was standing behind his drum set, not moving in any direction and not to attempting to flee was unconstitutional. The law in the Sixth Circuit as of July 16, 2010, had clearly established this right to be free from physical force when one is not resisting the police and Officers McCaig and Barkman would reasonably have been apprised that the use of a taser on a non-resistant subject who

21

was not threatening officers nor attempting to evade arrest would be a violation of a constitutional right. *Kijowski*, 372 F. App'x at 600.[5]  In *Kijowski*, decided three months before Plaintiff's arrest, the Sixth Circuit held that "[a]bsent some compelling justification - such as the potential escape of a dangerous criminal or the threat of immediate harm - the use of such a weapon on a non-resistant person is unreasonable" and found that the right to be free from such use of force had been clearly established by a line of Sixth Circuit cases beginning as early as 1998. *Id.*  Mrs. Lucier's testimony blatantly contradicting the officers' accounts of events that transpired in the basement of the Lucier home creates "factual disputes that are material to the reasonableness inquiry that preclude summary judgment for [the officers] - specifically, whether [Mr. Lucier] posed a threat or actively resisted arrest." *Burgess*, 735 F.3d at 474.  Accordingly, Officers Barkman and McCaig are not entitled to summary judgment based on qualified immunity on Plaintiff's claims premised upon the tasings in the basement of Plaintiff's home.

> **b.    Officer McCaig's deployment of his taser in drive stun mode to Plaintiff's hip when Plaintiff was seated in the back of the patrol car.**

Whether Officer McCaig violated Plaintiff's right to be free from excessive force by delivering a single drive stun to Plaintiff's hip while Plaintiff was seated sideways in the back of the patrol car, handcuffed and kicking his legs out the side of the vehicle and, if so, whether Plaintiff's constitutional right to be free from such use of the taser was clearly established on July 16, 2010, presents a more difficult question.  Although Plaintiff remembers nothing of events that transpired in the basement, Plaintiff does recall sitting in the back of the patrol car after being brought up from

---

[5] Although *Kijowski* is an unpublished Sixth Circuit decision, it has been reaffirmed and relied upon in numerous subsequent published Sixth Circuit decisions. *See, e.g. Hagans v. Franklin County Sheriff's Office*, 695 F.3d 505, 509 (6th Cir. 2012); *Austin v. Redford Twp. Police Dept.*, 690 F.3d 490, 498 (6th Cir. 2012); *Bennett v. Krakowski*, 671 F.3d 553, 561 (6th Cir. 2011).

the basement.  He recalls that he was sitting sideways with his feet outside the car and he remembers

the officers telling him to put his feet in the car.  (William Lucier Dep. 62-63.)  He recalled that this

was difficult for him to do because of prior injuries to his back but he does not remember what

police said to him or what he said or did in response to their commands:

> Q:   So you came upstairs, hugged your wife, and the next thing you remember, you were sitting outside with police officers?
> A:   Yes.
>
>          *                       *                       *
>
> A:   I remember sitting with my legs outside of the cop car, and they kept trying to spin me in, and I couldn't do it.
> Q:   Why couldn't you do it?
> A:   Because I don't spin that way.  My back is fused, and I can't spin like that, and then I don't remember anything from there.
> Q:   So you had your body sitting on the police car backseat, correct? Your butt was sitting on the seat?
> A:   I was, yes.
> Q:   Your legs were stretched outside of the car?
> A:   I would assume they were outside, yes.
> Q:   Do you remember the police officers saying anything to you?
> A:   Put your feet in the car.
> Q:   Did you say anything to them?
> A:   I don't remember.
> Q:   Do you remember if the officer said this once or more than once?
> A:   I don't remember.
> Q:   Did you tell them I can't move, I can't get my feet in?
> A:   I don't remember what I said.
> Q:   Do you remember doing anything with your feet, trying to move them, kicking? I mean, what do you remember?
> A:   I remember my feet being outside the car.  That is - like I said, I don't remember anything other than that.
> Q:   Did either one of the officers, if you recall, ever lean down and try to lift your feet up into the car?
> A:   I don't know.
> Q:   What is the next thing you remember?
> A:   Waking up in jail.

William Lucier Dep. 61-63.

      Plaintiff's wife was not outside at the time of these events.  (Pl.'s Resp. Ex. 3, March 7, 2013

Deposition of Michelle Lucier, 56-63, 62-63.)  Plaintiff has presented no evidence of any other

eyewitness accounts of these events, leaving Barkman and McCaig's version of what Plaintiff said

and did outside at the patrol car uncontradicted by the record.  McCaig testified that Plaintiff refused

his commands to get into the vehicle, continued being verbally abusive and was kicking his feet:

| | |
|---|---|
| Q: | Okay, what happened when you got outside? |
| A: | I opened the car door and advised him to get in. |
| Q: | And then what happened. |
| A: | He started refusing and I said, "Get in the car." |
| Q: | How was he refusing? |
| A: | Once I – once he started getting in the car, I said, "You got to put your legs in the car."  You know, "F*** you, I am not doing this," whatever, started kicking, so I advised him, probably two or three times, "Listen, you are going to get tased again," which it isn't actually deploying a Taser, it's called a "drive stun" and – |
| Q: | Go ahead. |
| A: | – he kept kicking and kicking; I went to deploy the Taser, or drive stun him; I don't even think I hit him, but because I – the Taser went off, I put down that drive stun was attempted or deployed…He finally gets in, refuses to put his feet in, starts kicking, I advise him, "Listen, you are going to get tased again," I probably told him once or twice, he kept refusing. |
| Q: | And he was in handcuffs? |
| A: | Yep. |
| Q: | And you drive stunned him while he was in handcuffs? |
| A: | I attempted to, yes. |
| Q: | Have you ever tased anybody while they were in handcuffs before? |
| A: | Have I ever tased anybody? |
| Q: | While they were in handcuffs? |
| A: | Nope. Most people don't start kicking at you. Once again, that's active aggression, like we were talking to earlier. |
| Q: | Was Mr. Lucier going anywhere; was there any risk that he would be able to flee? |
| A: | There was a risk that we'd have an injury. |
| Q: | How's that? |
| A: | Ma'am, he was kicking at me. |
| Q: | Okay. You couldn't step back away from him to be done with his fit? |
| A: | Hmm? |
| Q: | Could you have stepped back a couple of feet and out of the way of his feet? |
| A: | I could've. |
| Q: | Okay. Could you have gone around the other side and pulled him in from the arms? |
| A: | That's just as dangerous. |

Q:    How is that?

A:    Well, with his arms behind his back, if I pull him I could separate his shoulder or whatever, too.

McCaig Dep. 17-20.   In his deposition, Officer McCaig stated that Plaintiff was seated in the back of the patrol car "kicking at me." However, in McCaig's Incident Report, completed the morning of the arrest, McCaig stated that when seated in the patrol car in handcuffs, Plaintiff was "kicking at Cpl. Barkman" and refusing commands to put his "feet in the car and stop kicking." (ECF No. 28, Ex. 12, McCaig Incident Rep. 1.)   At this point, according to McCaig's incident report, he delivered "one short drive stun to the suspect's left hip and he complied." *Id.*

Officer Barkman, at his deposition, did not have an independent recollection of how the officers got Mr. Lucier into the patrol car. (Barkman Dep. 81, 87.)   However, in his Incident Report, also completed the morning of the arrest, Barkman reported that Plaintiff was seated in the rear of the patrol car "but refused to put his feet in and began to kick me." (ECF No. 28, Ex. 12, Incident Report 2.)   Barkman further reported that "McCaig then went to the drivers side rear door and [g]ave him the same order twice to stop kicking me and place his legs in the car, [but] he didn't comply until Sergeant McCaig drive stunned him in the left hip which gained [Plaintiff's] compliance." *Id.*

There appears to be an issue of fact as to whether Plaintiff allegedly was kicking McCaig or Barkman, or both, but whether that disputed fact is material is another question.  Plaintiff argues that the evidence demonstrates that it was Barkman that Plaintiff allegedly kicked and that Barkman did not see fit to deploy his taser in self defense, suggesting that McCaig then, who was not being kicked, had no reason to deploy his taser.  But whether the threat posed by Plaintiff's kicking was directed to Barkman or McCaig seems immaterial under the circumstances.  If, as the undisputed testimony of Officer McCaig establishes, the kicking indeed constituted active aggression and

25

resistance and posed an immediate threat of harm to Barkman who was standing near Plaintiff, McCaig would be justified in deploying his taser to diffuse the threat of harm to Barkman and gain Plaintiff's compliance with officers' commands. *See Miller v. Village of Pinckney*, 365 F. App'x 652, 655 (6th Cir. 2010) (analyzing the reasonableness of an officer's use of force to diffuse a threat posed to a fellow officer). The relevant inquiry is whether Mr. Lucier was "belligerent or threatening toward [officers], or was actively resisting arrest," such that deploying the taser was objectively reasonable under the circumstances. *Austin*, 690 F.3d at 498.

It is well established in this Circuit that "[a]bsent some compelling justification—such as the potential escape of a dangerous criminal or the threat of immediate harm—the use of [a taser] on a non-resistant person is unreasonable." *Kijowski,* 372 F. App'x. at 600 (absent evidence that suspect was resisting arrest or an immediate threat to officers safety, use of "stun gun" was not objectively reasonable). Recent Sixth Circuit cases have addressed the specific question presented here of when the use of taser on a handcuffed suspect to gain compliance with officer's commands constitutes excessive force. In *Austin*, *supra*, plaintiff led officers on a high speed chase and the evidence established that Austin had actively and forcefully resisted efforts to restrain and handcuff him, necessitating the deployment of tasers to subdue him, which the Sixth Circuit found to be an objectively reasonable use of force under the circumstances of that case. *Id*. at 496-97. However, after being handcuffed Austin was escorted without incident and placed in the back of the patrol car, leaving only his feet outside, when officers tased him again to gain his compliance with their requests that he get fully in the car. 690 F.3d at 498. Austin testified, and there was no evidence to the contrary, that he was not actively resisting officers' commands and was only asking officers to roll down the window before closing him in the back seat because he was feeling short of breath.

The Sixth Circuit found that at the time of Austin's arrest on August 5, 2005, it was clearly established that the use of a taser to gain compliance with police commands on a restrained suspect who was not a dangerous criminal with the potential to escape nor posing the threat of immediate harm to the officers was objectively unreasonable. *Austin* distinguished cases where the suspect was belligerent or physically threatening toward officers or actively resisting arrest: "There is no evidence or allegation that Austin was belligerent, threatening or assaulting officers, or attempting to escape. As mentioned above, it is well established in this Circuit that the use of non-lethal, temporarily incapacitating force on a handcuffed suspect who no longer poses a safety threat, flight risk, and/or is not resisting arrest constitutes excessive force." *Id*. at 498-99.  *Austin* distinguished both *Devoe*, *supra*, in which the handcuffed suspect was hostile and belligerent and refusing orders to get in the police car and *Alexander*, *supra*, in which  the handcuffed suspect ignored multiple requests to enter the patrol car, "as cases involving belligerent and hostile suspects who had threatened officers either before or during the order to enter the police car." *Id*. at 498.  The Sixth Circuit held:

> Viewing the evidence in the light most favorable to Austin, the district court found that Austin was not resisting; he was disoriented from at least two prior Taser deployments and at least one attack by a police dog; he was experiencing and complaining of shortness of breath; he was already placed in the patrol car leaving only his feet outside; and he did not have time to comply with Morgan's order before Morgan used his Taser. There is no evidence or allegation that Austin was belligerent, threatening or assaulting officers, or attempting to escape. As mentioned above, it is well established in this Circuit that the use of non-lethal, temporarily incapacitating force on a handcuffed suspect who no longer poses a safety threat, flight risk, and/or is not resisting arrest constitutes excessive force. *Michaels[v. City of Vermillion]*, 539 F. Supp. 2d [975] at 985 [(N.D. Ohio 2008)]. "Even without precise knowledge that the use of the [T]aser would be a violation of a constitutional right," on these facts, Morgan "should have known based on analogous cases that [his] actions were unreasonable." *Landis v. Baker*, 297 Fed. Appx. 453, 463 (6th

27

Cir.2008). Defendants' legal argument that this Circuit's precedent on the use of excessive force on subdued and unresisting subjects is irrelevant to situations involving noncompliance with police orders fails.

690 F.3d at 498-99.

In *Austin*, unlike this case, the suspect did recall the events surrounding the officers' efforts to gain his compliance with commands to put his feet in the car.  Plaintiff in *Austin* testified that he was not physically or actively refusing officer's commands but was having trouble breathing and was asking to have the window rolled down before he got in the car.  The court found no evidence that Austin "was belligerent, threatening or assaulting officer." *Id*. at 498.   Here, by contrast, Mr. Lucier cannot recall what was said as he was seated in the patrol car, nor can he recall whether or not he was resisting or kicking or behaving in a belligerent manner.  While we cannot know the exact demeanor that confronted officers out at that patrol car, there is no evidence to contradict McCaig's testimony that Mr. Lucier was belligerent, swearing, kicking at them and refusing their commands to put his legs in the car, despite being warned at least twice that he would be tased if he did not cooperate.  This testimony is corroborated by both Barkman's and McCaig's Incident Reports.  Whatever Plaintiff's demeanor may have been, based upon these undisputed facts, Officer McCaig sensed a threat of injury.[6]  These facts distinguish this case from *Austin* and invite a closer comparison to *Devoe* and *Alexander*, which were distinguished by the Sixth Circuit in *Austin* precisely because the plaintiffs in those cases were "belligerent and hostile suspects who had threatened officers either before or during the order to enter the police car." *Austin*, 690 F.3d at 498.

In *Devoe*, distinguishing cases where the use of the taser on a handcuffed suspect who was

---

[6] Mr. Lucier did testify that his behavior that night could have been caused by both the tequila and an elevated ammonia level and that in such a state he "get[s] incredibly strong," and it "takes five, six, eight people to hold me down, depending on the seizure."  (William Lucier Dep. at 88-89.)

subdued and no longer resisting or threatening the officers was found to be objectively unreasonable, the court concluded:

> Even after being handcuffed, Mr. DeVoe continue[d] to argue with the officers and refused to comply with the officers' verbal commands to enter the patrol car. Attempting to physically force Mr. DeVoe into the vehicle likely would have escalated the situation into a physical struggle in which Mr. DeVoe or the officers could have been seriously injured. The Court therefore concludes that Officer Sommerfeld's single use of the taser gun causing a one-time shocking which did not inflict any serious injury was a reasonable use of force under the circumstances.

2006 WL 334297, at *7.  Concluding that use of the taser under these circumstances was not gratuitous force, the court observed:  "While Mr. DeVoe was handcuffed when he was stunned with the taser gun, there is no genuine issue of material fact that he still was resisting the officers' commands to enter the police car and was arguing with them." *Id.*   Similarly, in *Alexander*, the court reasoned:

> Although Plaintiff has raised questions of fact as to how much of a threat he actually posed to the officers in the immediate sense, it remains undisputed that Plaintiff did not comply with the officers' orders to enter the patrol car. Officer Wylie deployed the taser only after repeated requests were not obeyed and with the knowledge that Plaintiff had shown a belligerent attitude, threatening officers, following his arrest. Moreover, the parties do not dispute that Officer Wylie used the taser only once to force compliance and that the contact was not disabling—Plaintiff immediately climbed into the patrol car after being tased. While it is clear that the gratuitous use of force on a suspect who has already been subdued and placed in handcuffs is unconstitutional, this is not such a case: the single use of a taser cannot be compared to the repeated or prolonged uses of non-deadly force found gratuitous in other contexts.

2009 WL 3241974, at *2.

Even viewing the facts in the light most favorable to the Plaintiff, it is undisputed that at this point in the arrest, Plaintiff was belligerent, hostile, swearing, kicking at officers who were trying to place him in the car and refusing to obey their commands.  It is also undisputed that officers had observed the extensive destruction of property Plaintiff had just committed in his own home just

minutes before their arrival.  McCaig testified that, notwithstanding that Plaintiff was handcuffed and sitting in the patrol car, he believed that Plaintiff's belligerent, hostile demeanor and his kicking of his legs posed a threat of injury.  Under these circumstances, McCaig's decision to deploy his taser in drive stun mode one time to gain Plaintiff's compliance was not objectively unreasonable. Efforts to subdue Plaintiff by other means may have been available to officers, but that does not make the decision to deploy the taser, rather than engage Plaintiff in a physical struggle that may have harmed him or officers under the circumstances then facing them, constitutionally unreasonable.  "An officer's use of force does not become constitutionally unreasonable merely because, after the dust has settled, we can imagine a more reasonable way for responding to an officer in need."  *Miller*, 365 F. App'x at 655 (citing *Illinois v. Lafayette*, 462 U.S. 640, 647 (1983)).

Even assuming McCaig's use of his taser under these circumstances was objectively unreasonable, *Devoe* and *Alexander*, and the Sixth Circuit's distinction of those cases in *Austin*, demonstrate that his decision to deliver a single short drive stun to gain the compliance of a belligerent, hostile suspect who was handcuffed but continued actively resisting officers' efforts to subdue him would fall within  that "hazy border" in which an officer's conduct is protected by the cloak of qualified immunity.  As the Sixth Circuit recognized in *Hagans*, "close calls" merit this protection:

> [T]hese factors must be assessed together with, not apart from, the reality that Hagans was out of control and continued forcefully to resist arrest. As the district court recognized, the combination of factors presented Officer Ratcliff with a "close call," R. 63 at 14, as some factors cut in favor of using the taser while other factors cut against it. The essence of qualified immunity, however, is to give government officials cover when they resolve close calls in reasonable (even if ultimately incorrect) ways. *See al-Kidd*, 131 S.Ct. at 2085. The fact remains that, prior to May 2007 (and for several years after), no case in any circuit held that officers used excessive force by tasing suspects who were actively resisting arrest, even though many of them, like Hagans, were suspected of innocuous crimes, posed little risk of

30

escape and had not yet physically harmed anybody.

*Hagans*, 695 F.3d at 510-11.  The same is true here because, at the very least, "the law governing the use of a taser to gain an arrestee's compliance with police officer commands [on July 16, 2010 was] hazy."  *Alexander*, 2009 WL 3241974, at *2.

In this case, viewing the facts in the light most favorable to the Plaintiff, officers knew that Plaintiff had violently destroyed property in his home, prompting his wife to summon them, and were faced with a belligerent and hostile suspect who was kicking at them, continuing to resist and continuing to refuse to comply with their commands.  As of July 16, 2010, the law in this District and in the Sixth Circuit suggested that the use of a taser on a handcuffed suspect who actively resisted arrest and who was belligerent and threatening to officers was not objectively unreasonable. While no case provided an exact factual parallel, nor were there cases that by analogy would have informed officer McCaig that his actions were clearly unreasonable.  *Landis*, 297 F. App'x at 463. The Court concludes that McCaig is entitled to summary judgment based upon qualified immunity as to any claim premised on the single drive stun deployed in the back of the patrol car.

**2.      The slap on the face while Plaintiff was in handcuffs.**

According to Mrs. Lucier, for no apparent reason, Barkman slapped Plaintiff in the face after placing him in handcuffs "so hard that it echoed across the room."  It is well established that "a slap to the face of a handcuffed suspect—even a verbally unruly suspect—is not a reasonable means of achieving anything more than perhaps further antagonizing or humiliating the suspect."  *Pigram ex. rel Pigram v. Chaudoin*, 199 F. App'x 509, 513 (6th Cir. 2006) (citing *Carico v. Benton, Ireland & Stovall*, 68 F. App'x. 632, 637 (6th Cir. 2003) (noting that the plaintiff "can clearly claim excessive force against [the officer] for the slap to the face")).

31

Barkman states that Mr. Lucier attempted to spit at him and that Barkman was pushing Plaintiff's face away to avoid being spat upon.  However, viewing the facts in the light most favorable to the Plaintiff, as the Court must on summary judgment, there was no spitting and the slap was entirely gratuitous.  Such a slap would amount to a constitutionally excessive use of force on a totally subdued and restrained individual who was not attempting to flee.  The right to be from such acts of gratuitous force was clearly established as of July 16, 2010.  *See, e.g. Pigram,* 199 F. App'x at 513 ("This Court's case law supports Pigram's right not to be slapped gratuitously.") Because there is a genuine issue as to whether Barkman in fact slapped Plaintiff in the face for no apparent reason, Barkman is not entitled to qualified immunity on the excessive force claim based upon the slap to Plaintiff's face while Plaintiff allegedly stood compliant in the basement of his home in handcuffs and summary judgment is denied to Barkman on this claim.

### B.      Plaintiff's Excessive Force Claims are not Barred by *Heck v. Humphrey*

Defendants claim that Mr. Lucier's guilty plea to resisting arrest bars his § 1983 excessive force claim under the principles established in *Heck v. Humphrey*, 512 U.S. 477 (1994).  *Heck* holds, in pertinent part, that:

> [I]n order to recover damages for allegedly unconstitutional conviction or imprisonment, or for other harm caused by actions whose unlawfulness would render a conviction or sentence invalid, a § 1983 plaintiff must prove that the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus, 28 U.S.C. § 2254. A claim for damages bearing that relationship to a conviction or sentence that has not been so invalidated is not cognizable under § 1983. Thus, when a state prisoner seeks damages in a § 1983 suit, the district court must consider whether a judgment in favor of the plaintiff would necessarily imply the invalidity of his conviction or sentence; if it would, the complaint must be dismissed unless the plaintiff can demonstrate that the conviction or sentence has already been invalidated. But if the district court determines that the plaintiff's action, even if successful, will not demonstrate the invalidity of any outstanding criminal judgment against the plaintiff,

the action should be allowed to proceed, in the absence of some other bar to the suit.

512 U.S. at 486-87 (footnotes omitted).

By way of illustration of a case in which a § 1983 action would not directly attack the state court conviction but nonetheless if successful would necessarily imply the invalidity of the state court conviction, the Court in *Heck* offered the following example:

> An example of this latter category—a § 1983 action that does not seek damages directly attributable to conviction or confinement but whose successful prosecution would necessarily imply that the plaintiff's criminal conviction was wrongful—would be the following: A state defendant is convicted of and sentenced for the crime of resisting arrest, defined as intentionally preventing a peace officer from effecting a *lawful* arrest. (This is a common definition of that offense. *See People v. Peacock*, 68 N.Y.2d 675, 505 N.Y.S.2d 594, 496 N.E.2d 683 (1986); 4 C. Torcia, Wharton's Criminal Law § 593, p. 307 (14th ed. 1981).) He then brings a § 1983 action against the arresting officer, seeking damages for violation of his Fourth Amendment right to be free from unreasonable seizures. In order to prevail in this § 1983 action, he would have to negate an element of the offense of which he has been convicted. Regardless of the state law concerning res judicata, *see* n. 2, supra, the § 1983 action will not lie.

512 U.S. at 487 n. 6.

Thus, to come within the *Heck* exception on an excessive force claim, either (1) the criminal provision must make the lack of excessive force an element of the crime or (2) excessive force must be an available affirmative defense to the crime. *Schreiber v. Moe*, 596 F.3d 323, 334 (6th Cir. 2010). In analyzing an excessive force claim under *Heck*, "the court must look both to the claims raised under § 1983 and to the specific offenses for which the § 1983 claimant was convicted." *Id*. "The mere fact that the conviction and the § 1983 claim arise from the same set of facts is irrelevant if the two are consistent with each other." *Id*. The underlying inquiry is whether "the § 1983 suit seeks a determination of a fact that, if true, would have precluded the conviction." *Id*.

The Court in *Schreiber* analyzed the *Heck* bar as it related to the Michigan resisting arrest

statute and concluded that nothing in the text of that statute, Mich. Comp. Laws § 750.81d(1), suggests that the state must prove as an element of the crime that the police did not use excessive force.  Indeed, the court noted, "the Court of Appeals of Michigan [] found that a lawful arrest is not one of the elements of § 750.81d(1)" in *People v. Ventura*, 262 Mich. App. 370 (2004).  *Id*. Moreover, the court noted in *Schreiber*, Michigan case law suggested "that excessive force by the police is not a defense to a resisting-arrest conviction."  *Id*. (citing *People v. Hill*, No. 283951, 2009 WL 1830750, at *3 (Mich. Ct. App. June 25, 2009) (finding no "authority to indicate that the alleged use of excessive force by police is a valid defense to resisting and obstructing" under the Michigan statute).

In this case, Plaintiff pled guilty to violating the City of Ecorse Ordinance relating to the crime of resisting arrest, which reads as follows:

> Sec. 17-21. Resisting Arrest.
>
> A person commits the offense of resisting arrest if he intentionally prevents or attempts to prevent a peace officer, acting under color of his official authority, from affecting an arrest of the actor or another by:
>
> (1)    Using or threatening to use physical force or violence against the peace officer or another; or
>
> (2)    Using any other means creating a substantial risk of causing physical injury to the peace officer or another.

ECF No. 39, Jt. Resp. Ex. A 1.

At Plaintiff's July 21, 2010 plea hearing before Michigan District Court Judge Michael F. Ciungan, the following colloquy took place between Judge Ciungan and Plaintiff:

> Court:          All right, sir.  So, you met with the prosecutor.
> Defendant:   Yes, sir, I did.
> Court:          And the plea was this: If you pled to Count One of Resisting, he would dismiss Count Two [Obstructing] and Three [Assault &

34

|            |                                                                                      |
|------------|--------------------------------------------------------------------------------------|
|            | Battery].                                                                            |
| Defendant: | Yes.                                                                                 |
| Court:     | Is that correct?                                                                     |
| Defendant: | That is correct.                                                                     |
|            | *                    *                    *                                          |
| Court:     | And you are so pleading because on the date in question, July 16th, in the City of Ecorse at XXX, you did obstruct the officers from performing their lawful duty, is that correct? |
| Defendant: | Yes, sir, it is.                                                                     |
| Court:     | I'll accept the - the act as voluntary in understanding. . . .                       |

ECF No. 40-1, Supp. Jt. Resp. Ex. A, Transcript of July 21, 2010 Pretrial/Plea Hearing 3-4.  No facts were established at the plea hearing that shed any light on the nature of the obstructing and assault charges that were dropped.  Plaintiff Lucier pleaded guilty to violating the Ecorse resisting arrest ordinance based upon the very general factual predicate elicited at the plea hearing.[7]

The Ecorse ordinance is generally indistinguishable from Mich. Comp. Laws § 750.81d(1), the Michigan resisting arrest statute under which the plaintiff in *Schreiber* pleaded no contest.  That statutory section provides:

> Sec. 81d. (1) Except as provided in subsections (2), (3), and (4), an individual who assaults, batters, wounds, resists, obstructs, opposes, or endangers a person who the individual knows or has reason to know is performing his or her duties is guilty of a felony punishable by imprisonment for not more than 2 years or a fine of not more than $2,000.00, or both.

Mich. Comp. Laws § 750.81d(1).

Under the Michigan statute, the term "obstruct" is defined to "include[] the use or threatened use of physical interference or force or a knowing failure to comply with a lawful command." §

---

[7]  It is unclear from the record exactly what Plaintiff had been "resisting arrest" for, but this ambiguity does not affect the analysis.  *See Miller v. Village of Pinckney*, 365 F. App'x 652, 655 (6th Cir. 2010) (finding plaintiffs section 1983 claim not barred by *Heck* and noting that the relevant inquiry under *Heck* is whether the excessive force claim would "necessarily negate an *element* of the offense, not whether it would cast doubt on facts that the state court might or might not have relied on when accepting the plea") (emphasis in original)).

750.81d(7)(a).  As the court noted in the *Schreiber*, under this statute "one can be convicted . . .
simply for a knowing failure to comply with a lawful command."  596 F.3d at 334 (internal citation
and quotation marks omitted).  This is precisely what Lucier pleaded guilty to in this case and thus
*Schreiber* provides sound guidance here for reaching the conclusion that *Heck* does not bar
Plaintiff's excessive force claim.  *See also Shirley v. City of Eastpointe*, No. 11-14297, 2013 WL
4666890, at *7 (E.D. Mich. Aug. 30, 2013) (noting that "in addition to the ruling in *Schreiber*, a
number of Sixth Circuit and Eastern District of Michigan decisions recognize that a conviction for
resisting and obstructing a police officer does not preclude a plaintiff, whether under *Heck* or
principles of estoppel, from pursuing a § 1983 claim of excessive force arising out of the arrest that
led to the plaintiff's conviction" and collecting cases).

Defendants rely on *Houston v. Buffa*, No. 06-cv-10140, 2007 WL 1005715 (E.D. Mich.
March 30, 2007) but *Houston* is inapposite.  The court in *Houston*, interpreted the Ypsilanti
Ordinance for Interference with Police at issue there as requiring proof as an element of the crime
that the arrest was lawful and that the officers had not used excessive force:  "Thus, in order to find
Houston guilty of interference, the jury had to find that the Officers, in carrying out their duties,
were neither executing an *unlawful* arrest nor using an *unlawful*, or unreasonable, amount of force."
2007 WL 1005715, at * 6 (emphasis in original).  "What is relevant here is that Houston *could* have
raised both excessive force and false arrest as defenses to his Interference with Police charge
because either theory, if proven, would negate an element of the offense (the lawfulness of the
Officers' duties)."  (Emphasis in original).  The Court in *Houston* noted *Ventura* and the Michigan
Court of Appeals holding that lawfulness of the arrest is no longer an element of the crime but
specifically distinguished the Michigan resisting arrest statute (which is identical to the Ecorse

36

ordinance at issue here) from the Ypsilanti ordinance at issue in *Houston*, which the court interpreted as specifically requiring a showing that the officer did not act with excessive force in effectuating the arrest. *Id*. at *8.

Here, unlike in *Houston*, there is no evidence that the Ecorse ordinance required a finding of a lack of excessive force. *Houston* is inapt. Moreover, *Houston* pre-dates the Sixth Circuit's opinion in *Schreiber* and the court in *Houston* cites to that portion of the district court's opinion in *Schreiber* which was expressly overruled by the Sixth Circuit. As in *Schreiber*, the criminal provision at issue here does not make the lack of excessive force an element of the crime nor was excessive force an available affirmative defense. Therefore, under the clear guidance of *Schreiber*, the Court concludes that Plaintiff's excessive force claim is not barred under *Heck* because if plaintiff prevailed on his excessive force claim, it would not necessarily imply the invalidity of his conviction for (plea to) resisting arrest.[8]

## C.   Defendants Frierson, Graham and Barkman are Entitled To Summary Judgment on Plaintiff's Claim Based Upon An Alleged Failure to Intervene

"As a general matter, [an officer's] mere presence during [an] altercation, without a showing

---

[8] In *People v. Moreno*, 491 Mich. 38 (2012) the Michigan Supreme Court held that individuals have an inherent right to resist an unlawful arrest, overruling *Ventura*. Therefore, post-*Moreno*, the argument has been made that under *Heck,* if plaintiff prevailed on a subsequent excessive force claim, it would necessarily imply the invalidity of the conviction for resisting, which necessarily had to include a finding that the officers did not employ excessive force. But *Ventura*, not *Moreno*, was the law at the time of Plaintiff's conviction and *Ventura* controls here.   *See Cummings v. Lewis*, No. 303386, 2012 WL 2579678, at *2, n. 3 (Mich. Ct. App. July 3, 2012) (rejecting the invitation to bar plaintiff's excessive force claim under *Heck* based on *Moreno* when "*Ventura* was law at the time of plaintiff's plea"). *See also Henry v. City of Eastpointe Police Dep't*, No. 11-cv-10192, 2013 WL 1395851, at*10 (E.D. Mich. March 7, 2013) (Komives, MJ) (finding that plaintiff's excessive force claim was not barred under *Heck* and noting that whatever merit *Moreno* might lend to a *Heck* claim was irrelevant as *Ventura*, not *Moreno*, was the governing law when plaintiff was convicted).

of some responsibility, cannot suffice to subject them to liability." *Burgess*, 735 F.3d at 475. If an officer does not directly participate in the challenged conduct, "there must be a showing that they either supervised the [officers] who did so or owed [the plaintiff] a duty of protection." *Id*. To established that an officer not directly involved owed a duty of care, it must be shown that the officer "'observed or had reason to know that excessive force would be or was being used'" and "'had both the opportunity and the means to prevent the harm from occurring.'" *Id*. (quoting *Turner*, 119 F.3d at 429.) In determining whether an officer had both the opportunity and the means to intervene, the Court must determine that the incident being challenged lasted long enough for the officers to "both perceive what was going on and intercede to stop it." *Id*.

Defendants argued in their motion that Plaintiff has failed to establish that any of the Defendants who were merely present but not actively involved in this case could otherwise have acted to protect the Plaintiff. (ECF No. 18, Def.'s Mot. 6.) Plaintiff responded with the following sole response to the claim that Graham and Frierson failed to intervene: "Graham/Frierson Failure to Intercede," followed by a statement of the law. (ECF No. 28, Pl.'s Resp. 19.) Given the brevity and conclusory nature of this response, Plaintiff has effectively waived any claim based upon an alleged failure to intervene as to Graham and Frierson. *See Brown v. VHS of Michigan, Inc.*, ___F. App'x ___, 2013 WL 5583818, at *3 (6th Cir. Oct. 10, 2013) ("This Court's jurisprudence on abandonment of claims is clear: a plaintiff is deemed to have abandoned a claim when a plaintiff fails to address it in response to a motion for summary judgment.") (Collecting cases).

Even if this cursory response did suffice to merit review by the Court, Plaintiff has failed to designate from the record sufficient facts to permit the Court to find a genuine issue of material fact as to how either Graham or Frierson had either the opportunity or the means to prevent any harm

38

to Plaintiff from occurring in connection with the tasings in the basement.  The record establishes that Graham and Friereson were merely present in the basement of Plaintiff's home, that both tasers were deployed simultaneously and with little warning.  Nothing in Plaintiff's response brief discusses how either of these officers had the means or the opportunity to intervene to prevent any harm alleged to have come to Mr. Lucier.  Nor was this claim developed in any meaningful way at the hearing on Defendants' motion.  Plaintiff has not met his burden to come forward with evidence to support the essential elements of his failure to intervene claims sufficient to create a genuine issue of material fact in response to Defendants' motion for summary judgment.  *Celotex*, 477 U.S. at 322-23.  Accordingly, Defendants Graham and Frierson are entitled to summary judgment on any claim based upon a failure to intervene.

Plaintiff does not include Barkman in the cryptic heading of his responsive brief: "Graham/Frierson Failure to Intercede."  Plaintiff does mention Barkman once in the conclusory supporting paragraph, stating without further factual support: "During the third tasing, Barkman had the opportunity to stop McCaig, and failed."  (ECF No. 28, Pl.'s Resp. 20.)  Presumably, Plaintiff refers to McCaig's tasing at the patrol car.  First, the Court has already concluded that McCaig is entitled to qualified immunity for his conduct in tasing Plaintiff at the car.  Thus, Barkman can have committed no wrong in failing to intervene to stop him.  In any event, Plaintiff has utterly failed to meet his burden to support such a claim against Barkman with reference to the record evidence.

In response to Defendants' motion, Plaintiff was required to make a showing "sufficient to establish the existence of an element essential to [his] case, and on which [he] will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322-23.  Plaintiff's unexplained and unsupported claim that Barkman "had the opportunity to stop McCaig, and failed," without "cit[ation] to particular parts

of materials in the record" utterly fails to meet Plaintiff's burden under Rule 56(c)(1)(A).  It is the very purpose of Fed. R. Civ. P. 56 "to isolate and dispose of factually unsupported claims or defenses. . . ." *Celotex*, 477 U.S. at 323-34.

Even in the absence of the Court's finding that McCaig is entitled to qualified immunity on Plaintiff's claim premised upon the tasing in the car, Plaintiff's evidentiary failing on his claim that Barkman failed to intervene to prevent McCaig from violating his constitutional rights would mandate the entry of summary judgment for Defendant Barkman on any claim based upon a failure to intervene during the tasing by Officer McCaig at the patrol car.

### D. Defendants McCaig, Barkman and Frierson are Entitled to Summary Judgment on Plaintiff's Claims of Supervisory Liability[9]

To be liable on a theory of supervisory liability, a supervisor must have "either encouraged the specific incident of misconduct or in some other way directly participated in it." *Shehee v. Luttrell*, 199 F.3d 295, 300 (6th Cir. 1999) (quoting *Hays v. Jefferson Cnty.*, 668 F.2d 869, 874 (6th Cir. 1982)).  "At a minimum, a plaintiff must show that the official at least implicitly authorized, approved, or knowingly acquiesced in the unconstitutional conduct of the offending officers." *Id.* (quoting *Hays*, 668 F.2d at 874). It is well established that where there has been no constitutional violation, a supervisor cannot be liable for the acts of his subordinates. *McQueen v. Beecher Cmty.*

---

[9] Plaintiff's Complaint, Count V, alleges "Supervisory Liability Against Frierson, Bruno and Barkman and Champagne."  (Compl. ¶¶ 68-72.)  The Complaint lumps these Defendants together and also states that several individuals not even otherwise mentioned in the Complaint or named as Defendants (Worthy, Brown and Doe) were the proximate cause of Plaintiff's injuries. Count V also names Defendant Bruno, whom Plaintiff has stipulated to dismiss.  Defendant Champagne is not mentioned in Plaintiff's response to Defendants' motion for summary judgment on the supervisory liability claim and therefore he is entitled to summary judgment on any claims against him based upon a theory of supervisory liability.  *See VHS*, 2013 WL 5583818, at *3 (failure to respond to a claim presented in a motion for summary judgment constitutes abandonment of the claim).

*Sch*., 433 F.3d 460, 470 (6th Cir. 2006).

The only argument Plaintiff presents in response to Defendants' motion for summary judgment on Plaintiff's supervisory liability claim is found under the following heading in Plaintiff's response brief: "Supervisory Liability of McCaig, Barkman and Frierson. . . . Here, force used by Barkman and McCaig was unconstitutional, as was the decision of Frierson, McCaig, Barkman and their subordinates not to bring Plaintiff to the hospital despite their knowledge of his tasing. McCaig and Barkman actually participated in the unconstitutional force. McCaig, Barkman and Frierson may be held liable for unconstitutional lack of supervision."  (ECF No. 28, Pl.'s Resp. 24-25.)

This claim is utterly unintelligible and factually undeveloped without any citation to the summary judgment record. It is entirely unclear who is alleged to have supervised whom and as to what alleged unconstitutional acts. As an initial matter, Plaintiff has failed to respond in any way to Defendants' motion for summary judgment on Plaintiff's claim that he was unconstitutionally denied medical care to remove the taser probes from his body. Thus, any claim based upon the alleged failure "to bring Plaintiff to the hospital despite [] knowledge of his tasing," has been waived. *VHS*, 2013 WL 5583818, at *3 (failure to respond to a claim presented in a motion for summary judgment constitutes abandonment of the claim).

Moreover, Plaintiff fails to identify who the "subordinates"and "supervisors" are under this theory of liability and fails to define the underlying unconstitutional act(s) of the alleged subordinates. If Plaintiff is referring to the excessive force claims, both McCaig and Barkman are alleged to have directly participated and thus their alleged liability is not "supervisory" as to that claim.  With respect to the excessive force claims, Frierson is not alleged to have directly participated in this conduct and Plaintiff fails to provide any evidentiary support for the claim that

41

Frierson, who was a sergeant, the same rank as Barkman, was in a position to or did in any way "authorize, approve or acquiesce in" any of the alleged acts of excessive force. Plaintiff has not provided any evidence that Frierson was even aware that McCaig or Barkman were going to deploy their tasers or that he approved of or acquiesced in their conduct at the time. Plaintiff has failed to adequately respond to Defendants' motion for summary judgment on Plaintiff's amorphous claims of "supervisory liability." Again, Plaintiff's unexplained and unsupported claim of supervisory liability, lacking "cit[ation] to particular parts of materials in the record," utterly fails to meet Plaintiff's burden under Rule 56(c)(1)(A). Accordingly, Defendants McCaig, Barkman and Frierson (the only Defendants identified by Plaintiff in his response on this claim) are entitled to summary judgment on any claim based upon a theory of supervisory liability.

### E.   Plaintiff Fails to Create a Genuine Issue of Material Fact as to the City's Liability Under *Monell*

A municipality can be held liable under § 1983 where it is shown that a municipal custom or policy is the driving force behind the alleged constitutional violation. *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978) (stating that the drafters of § 1983 intended only to impose liability on a government that "causes" an employee to violate another's rights under color of some official policy). To prevail in such a suit, the plaintiff must show that the alleged violation of his federal rights was caused by a municipal policy or custom. *Thomas v. City of Chattanooga*, 398 F.3d 426, 429 (6th Cir. 2005). A plaintiff asserting a § 1983 claim on the basis of municipal custom or policy must identify the policy, connect the policy to the municipality, and show that the specific injury at issue was caused by the execution of that policy. *Graham v. County of Washtenaw*, 358 F.3d 377, 383 (6th Cir. 2004). The causal link must be strong enough to support a finding that the defendants' deliberate conduct can be deemed the "moving force" behind the violation. *Id.* (quoting *Waters v.*

*City of Morristown*, 242 F.3d 353, 362 (6th Cir. 2001)).

In *Thomas*, the Sixth Circuit identified four ways in which a plaintiff may prove the existence of an illegal policy or custom.  398 F.3d at 429.  The plaintiff can point to (1) the government's legislative enactments or official policies; (2) actions by officials with final decision-making authority; (3) a policy of inadequate training or supervision; or (4) a custom or practice of tolerating the violation of federal rights by its officers or agents.  *Id.*  Where no formal policy exists, the critical inquiry is whether there is a policy or custom that although not explicitly authorized "is so permanent and well settled as to constitute a custom or usage with the force of law."  *Jones v. Muskegon County*, 625 F.3d 935, 946 (6th Cir. 2010) (quoting *McClendon v. City of Detroit*, 255 F. App'x 980, 982 (6th Cir. 2007)).  A municipality cannot be held liable pursuant to 42 U.S.C. § 1983 on a theory of *respondeat superior*.  *Monell*, 436 U.S. at 691-95; *Phillips v. Roane County, Tenn.*, 534 F.3d 531, 543 (quoting *Shehee v. Luttrell*, 199 F.3d 295, 300 (6th Cir. 1999)).

Plaintiff's *Monell* claim is a moving target.  In his response to Defendants' motion for summary judgment, Plaintiff asserts a *Monell* claim based upon the City of Ecorse's alleged failure to train its officers on the proper procedures to be followed when taser probes become embedded in a subject who has been tased.  (ECF No. 28, Pl.'s Resp. 22-23.)  Plaintiff argued that the City of Ecorse had a policy that directed that officers "shall" require a tased subject to submit to medical treatment if taser probes become embedded and cannot be removed.  Plaintiff attached the City of Ecorse Police Department Taser Policy, which provides in pertinent part:

Post-Use Procedures

<u>Subject</u>
1.    Once the subject is secured and the Officer and the subject are in a secure safe location, the Taser officer will remove the probes using prescribed methods.  However, if the probes are [e]mbedded in soft tissue such as the

              neck, face, and groin, the officer shall require the subject to be treated by medical personnel.

2.      Once removed the probes will be inspected, if any part [is] missing or broken off the subject will be treated at a medical facility.

3.      If medical problems persist, the subject will be treated at a medical facility.

4.      Officers should be alert for any injury that may or may not have been brought about by police use of force, which left untreated, could become a possible serious problem for both the injured suspect and the dept.

ECF No. 37, Ex. 15, City of Ecorse Taser Policy.

Plaintiff does not complain that this Policy is unconstitutional. Plaintiff alleges that officers were inadequately trained as to this aspect of the Taser Policy and that the City of Ecorse was deliberately indifferent to this alleged lack of training, resulting in an alleged violation of Mr. Lucier's constitutional rights. Specifically, Plaintiff argued:

> The Taser Policy is an official policy of the City, which indicates the City's knowledge of the risk that serious medical needs of tased subjects would be ignored if the policy was not followed. A jury may find that the City was aware that failure to comply with the official policy resulted in the risk of injuries like those suffered by Plaintiff due to insufficient training and supervision.

ECF No. 28, Pl.'s Resp. 23.

To succeed on a claim for failure to supervise or train, the plaintiff must prove that: (1) the training or supervision was inadequate for the tasks the officer or employee was performing; (2) the inadequate training resulted from the defendants' deliberate indifference; (3) the inadequacy caused the injury. *Ellis v. Cleveland Municipal School Dist.*, 455 F.3d 690, 700 (6th Cir. 2006). "To establish deliberate indifference, the plaintiff must show prior instances of unconstitutional conduct demonstrating that the [City] has ignored a history of abuse and was clearly on notice that the training in this particular area was deficient and likely to cause injury." *Miller v. Sanilac County*,

44

606 F.3d 240, 255 (6th Cir. 2010) (quotation marks and citations omitted). Where failure to train and supervise claims are not couched as part of a pattern of unconstitutional practices, "a municipality may be held liable only where there is essentially a complete failure to train the police force, or training that is so reckless or grossly negligent that future police misconduct is almost inevitable or would properly be characterized as substantially certain to result." *Hays v. Jefferson County, Ky.*, 668 F.2d 869, 874 (6th Cir. 1982) (internal citations omitted).

Even assuming that Plaintiff could establish a widespread lack of adequate training in this regard (a matter of considerable doubt as most of the officers testified that they were aware of the proper protocol with regard to removing taser probes and follow-up medical treatment, *see, e.g.* Pl.'s Resp. Ex. 7, Barkman Dep. 18), Plaintiff has presented no evidence of prior instances involving City of Ecorse officers failing to follow the Taser probe removal policy that resulted in constitutional violations that would have put the City of Ecorse on notice of its need for better training in this area. The record contains absolutely no evidence that "the [City] has ignored a history of abuse and was clearly on notice that the training in this particular area was deficient and likely to cause injury." *Sanilac County*, 606 F.3d at 255. *See also Burgess*, 735 F.3d at 478-79 (finding that plaintiff failed to demonstrate the existence of prior instances of similar misconduct demonstrating that the defendant was on notice that its training and supervision in the particular area being challenged was deficient); *Savoie v. Martin*, 673 F.3d 488, 495 (6th Cir. 2012) ("'To establish deliberate indifference, the plaintiff must show prior instances of unconstitutional conduct demonstrating that the [employer] has ignored a history of abuse and was clearly on notice that the training in this particular area was deficient and likely to cause injury.'") (quoting *Sanilac County*, *supra*) (alteration in original); *Hearon v. City of Ferndale*, No. 11-14481, 2013 WL 823233, at *16 (E.D.

Mich. March 6, 2013) (finding that plaintiff failed to establish deliberate indifference where there was no evidence of prior instances of unconstitutional conduct demonstrating that the City had "ignored a history of abuse and was clearly on notice that the training in this particular area was deficient and likely to cause injury").

Nor has Plaintiff argued, nor could he, that the alleged lack of training with regard to removal of taser probes could fall within that "narrow range of circumstances [in which] a pattern of similar violations might not be necessary to show deliberate indifference." *Connick v. Thompson*, 131 S.Ct. 1350, 1361 (2011). Accordingly, the City of Ecorse is entitled to summary judgment on any claim of *Monell* liability premised upon the alleged failure to adequately train its officers with regard to the City's Taser probe removal and medical follow up policy.

In any event, Plaintiff appears to have abandoned this theory sometime between briefing and oral argument as the theory espoused at oral argument did not mention the taser probe removal and medical follow up policy but focused instead on a claim based upon the allegation that the City of Ecorse has no policy in place to track claims of excessive force that are made against its officers. Plaintiff alleges that this lack of record keeping demonstrates the City of Ecorse's deliberate indifference to or tolerance of acts of excessive force by its officers. Again, Plaintiff offers no evidence of prior instances of constitutional violations that resulted from this alleged lack of record keeping that would have put the City on notice that its lack of record keeping was likely to result in its officers committing acts of excessive force. Indeed, this theory is completely undeveloped by the Plaintiff in any meaningful way.

Importantly, Plaintiff *does not* allege that the City of Ecorse fails to adequately train its officers on the use of excessive force. There is no record evidence of a such a claim and no failure

46

to train claim based upon the City's excessive force training has been alleged.  Thus, to be clear, this is not a case, such as the case hypothesized by the Supreme Court in *City of Canton v. Harris*, 489 U.S. 378 (1989),  where the City is alleged to be deliberately indifferent to the "moral certainty" that officers will called upon to use deadly force and yet has failed to train them altogether or has been made aware of so many excessive force violations by its officers, and the need to train them on the limitations on the use of such force has been to be "so obvious," that a failure to train them could be characterized as "deliberate indifference."  *Id.* at 390 n. 10.

Here, Plaintiff attacks the City's *record keeping* practices as they relate to allegations of excessive force or citizen complaints against its officers.  Although not clearly articulated, Plaintiff appears to be attempting to prove the existence of an unconstitutional custom or policy by demonstrating that the City of Ecorse has "a custom of tolerance or acquiescence of federal rights violations."  *Thomas*, 398 F.3d at 429.  Plaintiff appears to allege that the City of Ecorse had a custom or policy of tolerating the use of excessive force by its officers by allegedly failing to track allegations of excessive force and thereby failing to properly investigate such claims.  Even assuming such a theory of liability could support a *Monell* claim, Plaintiff has failed to come forward with sufficient evidence to create a genuine issue of fact on this claim.

*Thomas* is instructive here.  In *Thomas*, the plaintiffs "alleged that the City of Chattanooga had an unwritten policy, practice, or custom of condoning the use of excessive force against potential suspects."  398 F.3d at 429.  The court first noted that in order to assert a claim based on "inaction," alleging that a custom or policy is "unwritten but nevertheless entrenched," plaintiff must show:

> (1) the existence of a clear and persistent pattern of [illegal activity];
> (2) notice or constructive notice on the part of the [defendant];

> (3) the [defendant's] tacit approval of the unconstitutional conduct, such that their deliberate indifference in their failure to act can be said to amount to an official policy of inaction; and
> (4) that the [defendant's] custom was the "moving force" or direct causal link in the constitutional deprivation.

*Id*. (quoting *Doe v. Claiborne County*, 103 F.3d 495, 508 (6th Cir. 1996)).  The court then examined Plaintiffs' "evidence" of the alleged pattern of illegal activity, which included the affidavit of an expert who had "reviewed statistical evidence, consisting of some of the complaints and civil cover sheets from the forty-five suits filed against the Chattanooga Police Department alleging use of excessive force," and concluded, without examining the details of any of the suits or comparing data from neighboring municipalities regarding incidents of alleged excessive force in other communities,  that the department had a custom or policy of tolerating acts of excessive force, specifically evidenced by the facts of Thomases case, in which the officer who allegedly engaged in an act of excessive force against Thomas was not disciplined.  Finding insufficient evidence to create a genuine issue of fact on the custom or policy claim, the court reasoned:

> [Plaintiffs' expert] Davidson himself stated that "there's no bright line or rule" regarding how many complaints would be excessive, suggesting that an expert would need to conduct a more qualitative analysis. However, Davidson did not conduct such an analysis, and instead, in his deposition he merely mentioned a few cases where the courts have let the jury determine whether the municipality had an unwritten illegal policy. Even then, Davidson offered no qualitative analysis of those cases and how they were similar to the present case. Therefore, Davidson's conclusion, that the Police Department must have an unwritten policy of condoning excessive force because of the mere number of complaints previously filed against it, is insufficient to create a genuine issue of material fact on which a jury could reasonably find that such a policy exists.

*Thomas*, 398 F.3d at 432.  The court further noted that whether the internal investigation in Thomases case was mishandled was not a relevant question in the context of a municipal liability claim based upon an unwritten policy or custom:

48

There is potentially a real question as to whether officer Abernathy was justified in shooting Thomas. But this question is not before us. The question here is whether there was some sort of policy, custom, or practice in the Chattanooga Police Department of condoning excessive force, and under *Doe*, such a policy must be shown by a clear and persistent pattern. 103 F.3d at 508. The danger in appellants' argument is that they are attempting to infer a municipal-wide policy based solely on one instance of potential misconduct. This argument, taken to its logical end, would result in the collapsing of the municipal liability standard into a simple respondeat superior standard. This path to municipal liability has been forbidden by the Supreme Court. *Monell*, 436 U.S. at 694, 98 S.Ct. 2018; *cf. Bd. of County Comm'rs of Bryan County v. Brown*, 520 U.S. 397, 410, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997) (holding that a municipality was not liable for its hiring decision where the employee later went on to use excessive force against plaintiff because the plaintiff failed to demonstrate that the municipality directly caused the injury through its own deliberate action). Thus, without showing more than officer Abernathy's potentially excessive use of force in this particular case, Thomas cannot survive summary judgment.

*Id*. at 432-33.

Regarding the Thomases claim that the department had a policy of failing to investigate claims of excessive force, the court observed:

[A]ppellants must show not only that the investigation was inadequate, but that the flaws in this particular investigation were representative of (1) a clear and persistent pattern of illegal activity, (2) which the Department knew or should have known about, (3) yet remained deliberately indifferent about, and (4) that the Department's custom was the cause of the shooting here. *See Doe*, 103 F.3d at 508. Davidson's analysis focused mainly on the "deliberate indifference" aspects of this case.

As this Court noted in *Doe*, deliberate indifference "does not mean a collection of sloppy, or even reckless oversights; it means evidence showing an obvious, deliberate indifference" to the alleged violation. *Id*.; *Bd. of County Comm'rs of Bryan County*, 520 U.S. at 407, 117 S.Ct. 1382 (holding that deliberate indifference cannot be met by a "showing of simple or even heightened negligence"). The *Doe* Court found that even where a school board had some information that one of its teachers may have sexually abused students in the past and the board failed to remove him before he abused the plaintiff, the school board could not be found liable for having a policy, custom, or practice of condoning such abuse because there was no evidence that the school board failed to act regarding other teachers in similar circumstances; thus there was no evidence of any deliberate pattern. *Id*. at 508. *Doe* makes clear that the plaintiff bears a heavy burden in proving municipal liability, and he cannot rely solely on a single instance to infer a policy of deliberate indifference.

49

Despite the extreme circumstances here, appellants have not met their burden of showing that there is a genuine issue of whether an illegal Police Department policy exists. Appellants' expert inferred an illegal municipal policy from the Department's potentially insufficient investigation of Thomas's case, just as the plaintiff in *Doe* attempted to infer an illegal municipal policy from the school board's failure to remove the dangerous teacher at issue. Appellants' expert did not reach beyond the facts of this case to show any possibility of a pattern. Appellants point to this Court's finding in *Leach v. Sheriff of Shelby County*, 891 F.2d 1241 (6th Cir. 1989), in support of the notion that deliberate indifference can be demonstrated by a municipality's failure to adequately investigate claims. However, in *Leach*, this Court was convinced that the municipality had a policy of deliberate indifference to prisoners' medical needs based on the fact that there were several separate instances where the prison failed to investigate prisoner mistreatment. 891 F.2d at 1246-48 (noting that the lower court found that "at least 14 other paraplegics had received similar deplorable treatment"). Unlike the plaintiffs in *Leach*, appellants have failed to show several separate instances of the alleged rights violation.

\*                           \*                           \*

Because Davidson failed to provide any explanation for his reliance on the mere number of excessive force complaints against the Police Department, the basis of his opinion has been reduced to the facts of Thomas's case. These facts fall short of proving deliberate indifference by the municipality.

*Id*. at 433-34.

*Thomas* illustrates clearly that Plaintiff has failed to sustain her burden of meeting Defendants' motion for summary judgment on this *Monell* claim with sufficient evidence to create a genuine issue of material fact for trial.  Even assuming Plaintiff could establish that the department mishandled his citizens' complaint (a fact that Plaintiff has never actually established), such a finding could not support *Monell* liability.  Moreover, Plaintiff has misrepresented to the Court the nature of the record evidence regarding the City's "record keeping" practices with regard to excessive force litigation.  Plaintiff represented to the Court in briefing and at oral argument that the City of Ecorse presently has "no means of tracking litigation as it relates to excessive force allegations." This assertion is not supported by the record.  In fact, Police Chief Gerald Champagne

testified that the City does have a system for tracking both citizen complaints, which are reviewed by Champagne himself, and litigation matters against the officers which are tracked by the City Attorney's Office and by the City's Emergency Manager.  (Pl.'s Mot. Ex. 9, Champagne Dep. 5-6, 8.)  Champagne did not testify that excessive force cases weren't tracked just that they were not noted in the officer's personnel file.  (*Id*. at 7.)  Specifically, Champagne testified as follows:

> Q:  Anytime, from the time you have been here 'till today, is it possible that there is an officer working for you now, that has been sued for excessive force, that you don't know about?
> A:  Since I've been employed?
> Q:  Yeah.
> A:  No.
> Q:  Do you know if Officer Barkman has ever been sued for excessive force?
> A:  Since I've been here?
> Q:  Yeah.
> A:  I don't recall anything at this minute.
> Q:  And if he was, it wouldn't be in his personnel file?
> A:  Well, the – the litigation or the suit would not be in his personnel file; if an officer did something that warranted discipline, which may be in conjunction with that lawsuit, then that would be in his file or her file.
> Q:  But how would you find out – how would you [] found out if he or she did anything that warranted discipline, if they didn't report it and you didn't know, but yet there was ongoing litigation about it; do you have any way of finding that out?
> A:  I'm sure it would come to my attention through the litigation.
> Q:  How would it come to your attention?
> A:  Well, the city attorney would bring it to my attention, perhaps the emergency manager, whoever receives the suit.

ECF No. 28, Ex. 9, Champagne Dep. 63-64.  It is simply a misrepresentation of Chief Champagne's testimony to state that the City of Ecorse has no means of tracking its excessive force litigation. Thus, as a critical a starting point, Plaintiff has failed even to support the claim that the City "fails to track excessive force complaints."

But this evidentiary failing is only one of many in this fatally flawed custom or practice claim.  In this case, Plaintiff provides insufficient evidence to support the "pattern" aspect of his

claim, simply referring to three or four cases that Plaintiff claims involve allegations (the specifics of which are not disclosed) of excessive force against some of the Defendants in this case, one of which resulted in a consent judgment, one of which was dismissed in the officer's favor on summary judgment, one of which is still in the summary judgment stages and one which is allegedly "to be filed."  "A custom of tolerance claim requires a showing that there was a pattern of inadequately investigating similar claims."  *Burgess*, 735 F. 3d at 478 (citing *Thomas*).  Even if Plaintiff could establish that the City failed to investigate Plaintiff's allegations of excessive force in this case, he simply has failed to demonstrate a pattern of inadequate investigation of similar claims.  *Id*. ("[A]lthough Plaintiffs claim that [the chief] should have done more in his investigation of the takedown and treatment provided to Burgess, as in *Thomas*, they simply have not demonstrated a pattern of inadequate investigation of similar claims as required.")

"One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses, and [] it should be interpreted in a way that allows it to accomplish this purpose."  *Celotex*, 477 U.S. at 323-34.  It is clear that Plaintiff's claim that the City of Ecorse had a custom of tolerance with regard to excessive force claims is based inadequate data, relies largely inference and innuendo and fails to create a genuine issue of fact for trial on any *Monell* claim based upon the alleged failure to track excessive force complaints or the alleged failure to properly investigate such claims.[10]  Accordingly, the City of Ecorse is entitled to summary

---

[10]  Plaintiff referred the Court to an unpublished case from the United States District Court for the District of New Jersey, *White v. City of Trenton*, No. 06-5177, 2011 WL 6779595 (D.N.J. Dec. 27, 2011), in which an internal affairs summary report established among other things that "only 1 out of 160 excessive force citizen complaints resulted in the finding of a rule violation," and that multiple excessive force complaints against officers simply "dropped off the radar" or were "never resolved."  *Id*. at 10-11.  As discussed *supra*, no evidence even approaching this magnitude has been presented in this case and *White* does not provide a useful guide even were the Court inclined to

judgment on Plaintiff's *Monell* claim.

> **F.**   **Plaintiff's Assault and Battery Claim, to the Extent Based Upon Barkman and McCaig's Tasings in the Basement and the Slap in the Face, Survives Summary Judgment**

In Michigan, to recover under an assault theory, a plaintiff must show: (1) an intentional unlawful offer of corporal injury to another by force, or force unlawfully directed toward the person of another; (2) under circumstances which creates a well-founded apprehension of imminent contact; (3) coupled with the apparent present ability to accomplish the contact. *VanVorous v. Burmeister*, 262 Mich. App. 467 (2004). Battery is a "wilful and harmful or offensive touching of another person, which results from an act, intended to cause such a contact." *Id.* (internal quotation marks omitted). Michigan courts apply the objective reasonableness standard for excessive force claims under § 1983 in determining whether an officer has committed an assault and battery. *Wells v. City of Dearborn Heights*, 583 F. App'x 631, 641 n. 3 (6th Cir. 2013) (citing *VanVourous*, 262 Mich. App. at 483 ).

Because, when viewing the facts in the light most favorable to Plaintiff, the Court concludes that the tasings by Barkman and McCaig in the basement, and Barkman's slap to Plaintiff's face, constituted excessive force that was not objectively reasonable under the circumstances, *see supra* Section III.A., the Court denies summary judgment on Plaintiff's assault and battery claims to the extent they are based on that same conduct. Nor are Barkman and McCaig entitled to governmental immunity for acts of excessive force. *Wilkerson v. Warner*, __F. App'x__, 2013 WL 5878212, at *19 (6th Cir. Oct. 31, 2013) (quoting *Oliver v. Smith*, 290 Mich.App. 678, 810 N.W.2d 57, 64 (2010) (explaining that "a police officer's use of excessive force in effectuating an arrest is a ministerial act

_____

consider an unpublished case from another district.

and not entitled to the cloak of immunity")).

### G.   Defendants are Entitled to Summary Judgment on Plaintiff's Gross Negligence Claim

"Government employees can also be held liable for gross negligence under Michigan tort law. Mich. Comp. Laws § 691.1407(2)(c). Gross negligence is defined by statute as 'conduct so reckless as to demonstrate a substantial lack of concern for whether an injury results.'" Mich. Comp. Laws. § 691.1407(7)(a)." *Wells*, 538 F. App'x at 641. The Court has concluded that, viewing the facts in the light most favorable to the Plaintiff as it must do at this stage, Plaintiff's claims of excessive force and assault and battery against Barkman and McCaig based upon tasing Plaintiff in the basement and slapping him in the face survive summary judgment. Plaintiff cannot maintain a gross negligence claim against Barkman and McCaig based upon the same conduct that forms the basis for their assault and battery claim. *See Wells*, 538 F. App'x at 641-42. "[U]nder Michigan law, Wells cannot bring a gross-negligence claim that is premised on Mueller's alleged assault and battery of Wells [as] Michigan courts have repeatedly 'rejected attempts to transform claims involving elements of intentional torts into claims of gross negligence.'" (quoting *VanVorous*, 687 N.W.2d at 143). Accordingly, Barkman and McCaig are entitled to summary judgment on Plaintiff's gross negligence claim.

Plaintiff's claims against Graham and Frierson are based solely on their alleged failure to intervene. Because the Court has concluded that Graham and Frierson are entitled to summary judgment on these claims, Plaintiff has failed to establish a basis for a gross negligence claim against Graham and Frierson. *See Wells*, 538 F. App'x at 642 (finding no basis for a gross negligence claim under Michigan law where plaintiff did not establish a failure to intervene).

The City of Ecorse "has governmental immunity on [Plaintiff's] gross negligence claim."

54

*Garretson v. City of Madison Heights*, 407 F.3d 789, 800 (6th Cir. 2005). This leaves only Police Chief Champagne. The Court concludes that Plaintiff has failed to adduce evidence (or for that matter to articulate a claim) that Chief Champagne engaged in "conduct so reckless as to demonstrate a substantial lack of concern for whether an injury results," that was the proximate cause of Plaintiff's injuries.

## IV.    CONCLUSION

Viewing the facts in the light most favorable to the Plaintiff, the Court concludes that Barkman and McCaig are not entitled to qualified immunity on Plaintiff's claims of excessive force based upon the tasings in the basement and slap in the face that allegedly occurred in the course of Plaintiff's arrest and the Court DENIES their motion for summary judgment on these claims. Likewise, the Court DENIES Barkman and McCaig's motion for summary judgment on Plaintiff's assault and battery claim based upon that same conduct.

For the reasons stated above, the Court GRANTS Defendants' motion for summary judgment on all other claims and DISMISSES Plaintiff's Complaint WITH PREJUDICE against the City of Ecorse and Defendants Champagne, Frierson, Bruno, Tidwell and Graham.

IT IS SO ORDERED.

s/Paul D. Borman
Paul D. Borman
United States District Judge

Dated:  March 27, 2014

CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on March 27, 2014.

s/Deborah Tofil
Case Manager